# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:22-CR-00615 |
| | ) | |
| Plaintiff, | ) | JUDGE J. PHILIP CALABRESE |
| | ) | |
| v. | ) | |
| | ) | **DEFENDANT'S MOTION TO SUPPRESS** |
| LAWRENCE STURDIVANT, | ) | **ALL EVIDENCE STEMMING FROM THE** |
| | ) | **WARRANTLESS SEARCH OF HIS** |
| Defendant. | ) | **LOCATION DATA** |
| | ) | |
| | ) | |

Defendant Lawrence Sturdivant, through counsel, hereby respectfully moves to suppress all evidence acquired via automatic license plate reader searches in this case as well as all evidence derived from them. A Memorandum in support of this Motion is attached and incorporated by reference herein. Defendant Sturdivant further requests an evidentiary hearing and the opportunity to supplement or amend this Motion after such a hearing, if needed.

Respectfully submitted,

/s/ *Paul M. Flannery*
Paul M. Flannery (OH: 0091480)
Susan A. Jacobsen (OH: 0100620)
Flannery │ Georgalis, LLC
1375 E. 9th St., 30th Floor
Cleveland, OH 44114
Tel./Fax: (216) 367-2094 (Paul)
Tel./Fax: (216) 666-2319 (Susan)
paul@flannerygeorgalis.com
sjacobsen@flannerygeorgalis.com

*Attorneys for Defendant Lawrence Sturdivant*

## MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS

## I.    INTRODUCTION

Every day, millions of Americans drive to work, school, medical appointments, religious services, restaurants, the homes of friends and family, and more. Most would be surprised to learn that every time they travel the public roads to one of these places, their location data is being meticulously monitored and tracked in private databases for the government to analyze in real time or retroactively. Most would be even more surprised to learn that the government could access that data whenever they wanted, for whatever reason they wanted, without a warrant. Yet that is the current state of play: Every day, and in an increasing number of ways, law enforcement collects troves of data memorizing the precise travels of virtually anyone who drives, bikes, or walks the public roads. The government can then use that information, without a warrant, to obtain evidence and seek to investigate citizens. And that is exactly what happened in this case.

Using a system built around automatic license plate readers ("ALPR"), the government—all from a grainy image of a black car with a temporary tag—identified Mr. Sturdivant and built a 131-page dossier of movements over the course of a month. The government even went so far as to identify and then interview his girlfriend based on its comprehensive surveillance of Mr. Sturdivant's comings and goings.

More than that, this surveillance is only becoming more intense as time goes by. ALPR systems combine cameras with analytic image software to collect the plate numbers, images, date, time, and location of every vehicle passing by a camera.[1] The collection of this ALPR data is indiscriminate by design and captures images and/or video of every passing vehicle, regardless of

---

[1]  David J. Roberts and Meghann Casanova, "Automated License Plate Recognition Systems: Policy and Operational Guidance for Law Enforcement," (Sept. 2012), available at https://www.ojp.gov/pdffiles1/nij/grants/239604.pdf (last visited Sept. 30, 2024).

whether the government has any basis for suspecting a vehicle's driver committed an offence. *See* Roberts & Casanova, *supra note 1.* That data is then compiled and combined with other surveillance systems—like security cameras, gunshot detection systems and more—to show a detailed and comprehensive view of a person's comings and goings—either in real time, or, as in Mr. Sturdivant's case, retroactively. And all of these features and capabilities have grown more and more precise as technologies improve and new technologies (like facial recognition) come online.

In other words, Mr. Sturdivant's travels, and those of countless others, are tracked, stored, and preserved for law enforcement to peruse as they see fit, without a warrant or any judicial oversight. Law enforcement officers then conduct an unprecedented search of thousands—if not hundreds of thousands—of these location and travel records without a warrant or, indeed, any judicial supervision at all. This was despite the fact that, as the Supreme Court reaffirmed in *Carpenter v. United States*, 585 U.S. 296, 309-10 (2018), Mr. Sturdivant, along with the rest of us, has a constitutionally protected privacy interest in his historical location information.

This pervasive warrantless surveillance, collection, and search of our travels violates the Fourth Amendment. As a result, all evidence obtained from law enforcement's utilization of this unprecedented tracking system in this case, including the fruits of the ALPR evidence, should be suppressed. Because this search of Mr. Sturdivant's ALPR data violates the Fourth Amendment, the Court should also dismiss the indictment against Mr. Sturdivant.

## II.     STATEMENT OF FACTS

### A.     The ALPR System is a Vast and Interconnected Repository of Location Information.

Based on conversations the defense has had with various law enforcement agencies in Northeast Ohio during the discovery phase of this case, and as the testimony will show if this Court

grants Mr. Sturdivant's request for a hearing, the ALPR system in the Cleveland, Ohio area involves at least two distinct ALPR camera subsystems that work together and with other surveillance systems to blanket the city. The first is operated by Flock Safety ("Flock"), a private ALPR provider that installs and then leases access to its cameras to law enforcement agencies, allowing them to access and query those cameras via a cloud-based software platform.[2] Flock's platform also permits law enforcement agencies (as well as private customers, such as homeowner associations, schools, businesses, and individuals) to allow other Flock customers to access their cameras, forming an interlocking network of cameras across multiple customers, counties, and states nationwide.[3]

### 1. The Flock Safety Cameras:

The majority of local police departments in Cuyahoga County, Ohio have contracts with Flock based on the information obtained through subpoenas. *See* **Flock Safety Camera list, attached as Exhibit 1**. Documents produced in response to defense subpoenas identified approximately 667 Flock cameras in Cuyahoga County, Ohio and another approximately 255 in the surrounding counties, for a total of approximately 922 cameras. And that number includes only the cameras associated with law enforcement agencies. *Id.*

According to its website, Flock cameras have the capability to search not only license plate numbers, but also utilize "Vehicle Fingerprint" technology to identify and search vehicle characteristics including damage, temporary tags, decals, and alterations such as roof racks and

---

[2]   Flock Safety for Law Enforcement, available at https://www.flocksafety.com/industries/law-enforcement (last visited Sept. 30, 2024).

[3]   American Civil Liberties Union, *How to Pump the Brakes on Your Police Department's Use of Flock's Mass Surveillance License Plate Readers*, available at https://www.aclu.org/news/privacy-technology/how-to-pump-the-brakes-on-your-police-departments-use-of-flocks-mass-surveillance-license-plate-readers, February 13, 2023 (last visited Sept. 30, 2024).

aftermarket wheels, and then use those features to track a vehicle across multiple cameras.[4] In other words, the cameras can track your movements—as they did Mr. Sturdivant's—even if your license plate is not legible in a photo, which is exactly what occurred here. Flock can also provide its customers with software that turns their existing IP cameras[5] into ALPR readers through what it calls "Wing" integration.[6] Flock states on its website that its cameras are in "40+ states and servicing 1,200+ cities."[7]

These statistics are important because even if a particular law enforcement agency only purchases, say, fifty cameras, that agency has access to information from *all* Flock cameras, not just the cameras it individually leases. This expands exponentially the scope of the ALPR system, allowing the agency to access billions of images and thousands of cameras around the country, so long as the owners of those cameras (public or private) are willing to share access to them. An archived page from Flock's websites boasts "Use FlockOS's local and national search network to find the suspect vehicle across state lines, including up to **1 billion monthly plate reads**. All this

---

[4]    Flock FAQs, available at https://www.flocksafety.com/faq#camera and https://www.flocksafety.com/faq#software (last visited Sept. 30, 2024).

[5]    An Internet Protocol or "IP" camera is any digital camera that sends and receives image data over a network or the internet.

[6]    Flock Camera Integrations, available at https://www.flocksafety.com/devices/wing (last visited Sept. 30, 2024).

[7]    Johana Bhuiyan, *How expanding web of license plate readers could be 'weaponized' against abortion*, The Guardian (Oct. 6, 2022, 6:00 EDT), available at https://www.theguardian.com/world/2022/oct/06/how-expanding-web-of-license-plate-readers-could-be-weaponized-against-abortion (last visited Sept. 30, 2024).

is included, for FREE, for **any Flock Safety customer**" (capitalized emphases in original; bold emphasis added).[8]

### 2.  The ELSAG Cameras:

The second subsystem is a network of fixed ALPR cameras and software provided by Selex ES ("Selex"), a subsidiary of Leonardo S.p.A. We will refer to these cameras as "ELSAG cameras." The ELSAG camera network was established, and is apparently controlled by the Cuyahoga County, Ohio Sheriff's Office in coordination with other law enforcement agencies, and it has been substantially funded through federal grants. *See generally* **Cuyahoga County Emergency Services Advisory Board Investment/Project Request, attached as Exhibit 2.** It is counsel's current understanding that the system is hosted by the Chagrin Valley Dispatch, which coordinates first responders in Northeast Ohio. A contract between Selex and Cuyahoga County, Ohio ("the County") states Selex will provide the County "[s]oftware that has the ability to access the successful vendor's customer database without any additional cost from County." *See* **Contract between Cuyahoga County and Selex, p. 2, attached as Exhibit 3.** Selex's 2017 application to the County's Request for Proposal ("RFP") reveals the County has access to the "ELSAG Operations Center software suite," which has built-in data mining tools and can store geospatial information associated with each read that can be analyzed to detect patterns of behavior. *See* **RFP No. 41036, p. 7, attached as Exhibit 4**.

Based on a list of cameras provided by the County, we are aware of at least 75 ELSAG cameras located in at least 20 Cuyahoga County communities. *See* **Cuyahoga County list of ELSAG cameras, attached as Exhibit 5**. Notably, private organizations can also purchase

---

[8]   Flock Operating System – FlockOS, available at
      https://web.archive.org/web/20211103084916/https://www.flocksafety.com/flock-operating-system/ (last visited Sept. 30, 2024).

ELSAG cameras, and that data can also feed into the broader system, but Selex declined to provide a list of private cameras. It is also our understanding that the County continues to pursue additional funding and install additional cameras around the area. Another Selex RFP from 2020 shows the cameras can capture at least nine hundred plates per minute and the software "provide[s] complete ALPR sharing capability to external like-kind system [sic] and shall be able to query external servers using the National Institute of Justice (NIJ) approved JD XML format, also referred to as License Plate Reader Data (LPRD)." ***See* RFP No. 89, pp. 6-7, attached as Exhibit 6**. According to RFP No. 89, "[t]he County's current ALPR program collects approximately **9 million license plate images per month**, retaining all images for **1 year** per current policies." *Id.* at p. 7 (emphasis added).[9]

More granularly, the government advises that local police departments in Brooklyn, Highland Heights, and Newburgh Heights, Ohio, as well as Chagrin Valley Dispatch, were associated with the ALPR searches that identified Mr. Sturdivant as a suspect. And lists produced in discovery showing how law enforcement shares camera access illustrate the scope and interconnectedness of these systems. ***See* Flock Device Lists from the police departments of Brooklyn, Highland Heights, and Newburgh Heights, attached as Exhibits 7, 8, and 9, respectively**. These lists show that not only are cameras shared across the state of Ohio, but across the United States—for example, when an officer from the Newburgh Heights, Ohio Police Department runs a Flock search, they are accessing not only the Newburgh Heights Police Department's cameras, but cameras from other police departments across Ohio as well as departments in Michigan, Tennessee, Indiana, Kentucky, Alabama, Florida, Georgia, Texas, New

---

[9]    Both Flock and Selex were unwilling to provide a list of privately operated cameras (like those owned by housing developments or apartment complexes), which law enforcement agencies can also access.

Mexico, and Illinois. *See* **Newburgh Heights Police Department Flock Device List, attached as Exhibit 9**. And beyond individual departments, Chagrin Valley Dispatch is "the communication center for 30 municipalities in the greater Cleveland area. The dispatch center is the first step to providing emergency services to 318,000 residents over 186 square miles."[10] Chagrin Valley Dispatch alone has access to approximately 1,119 ALPR cameras in the greater Cleveland metropolitan area when it runs a search through its system. *See* **Email Regarding Chagrin Valley Dispatch, attached as Exhibit 10**.

The amount of data that an ALPR system of this sort can collect is staggering. For example, Piedmont, California's mere thirty (30) license plate readers generate somewhere between 1 and 1.4 million records *each month*. Cyris Farivar, *Habeas Data: Privacy v. the Rise of Surveillance Tech* 87 (1st ed. 2018). And such comprehensive monitoring provides much more detail than one would think. For example, when a man from San Leandro, California, submitted a public records request to see what ALPR data the government had on him, he received more than 100 photos, including wide shots of his car at a coffee shop and a friend's house. (*Id.* at 84.) As already discussed in this memorandum, there are thirty-seven (37) times the number of ALPR cameras currently active in the greater Cleveland, Ohio area as there were in Piedmont, California, counting only the government-owned cameras.

We also know that the ALPR system is detailed enough that from a few searches, the government was able to create a 131-page PowerPoint presentation tracking Sturdivant's alleged movements over time based on the ALPR data as well as additional information law enforcement

---

[10]  Chagrin Valley Dispatch, available at https://www.chagrinvalleydispatch.com/ (last visited Sept. 30, 2024).

collected as a direct result of the ALPR data.[11] *See* **Timeline with CDRs, attached as Exhibit 11**. The government tracked Mr. Sturdivant's movements from at least November 25, 2021, to December 26, 2021. *Id.* Some cameras in the presentation even show Mr. Sturdivant travelling on foot. *Id.* The presentation shows how the government tracked Mr. Sturdivant all over the greater Cleveland area for over a month and saw everywhere he was going and who he was associating with—including a person at an address who the government would later identify as Mr. Sturdivant's girlfriend, who they then interviewed. The more than a thousand cameras in the Cleveland area (each a separate pinpoint of data) are clearly more than enough information to allow the government to create a detailed log of the movements of its citizens, just as it did with Mr. Sturdivant.

Additionally, ALPR cameras can work in conjunction with other government surveillance systems such as Cleveland's Real Time Crime Center cameras, ShotSpotter gunshot detection technology, and cameras owned by private citizens who have registered their cameras with the police.[12] The threat from this sort of system is only growing. Law enforcement agencies are already employing face-recognition software that expands the logic of ALPRs to human faces. *See, e.g.* Kashmir Hill, *Your Face Belongs to Us* (1st ed. 2023) (describing the rise and dangers of facial recognition technology). The Fourth Amendment must be able to comprehend and address the privacy concerns these new law enforcement strategies raise, and it need not wait until they reach a dangerously granular level of specificity to do so. *See Carpenter*, 585 U.S. at 313 ("[T]he rule

---

[11]  The additional information came from several sources including evidence obtained through a cellular telephone search warrant and Cleveland's Real Time Crime Center cameras.

[12]  Isabel Lawrence, *Technology helps Cleveland police crack down on crime at Real Time Crime Center*, WKYC (May 23, 2023, updated 7:10 PM EDT), available at https://www.wkyc.com/article/news/local/cleveland/cleveland-police-utilize-technology-real-time-crime-center/95-265827ce-4fbb-4af8-b249-ef0327ddd021 (last visited Sept. 30, 2024).

the Court adopts 'must take account of more sophisticated systems that are already in use or in development.' While the records in this case reflect the state of technology at the start of the decade, the accuracy of [cellular telephone location data] is rapidly approaching GPS-level precision." (quoting *Kyllo v. United States*, 533, U.S. 27, 36 (2001)) (internal citation omitted)).

  **B. Investigation and Suspect Identification Hinged on ALR Technology.**

  In this case, the government generally alleges that Mr. Sturdivant committed a series of robberies at retail stores located within the Northern District of Ohio, between December 5, 2021, and December 26, 2021. But when the police began investigating, there was no footage of any of these crimes that directly tied Mr. Sturdivant to the robberies. Instead, witnesses and private surveillance camera footage identified only a black car—with temporary tags and a white bumper sticker or similar marking—at or near some of the robbery scenes. ***See* Report of Investigation 1 at p. 4, attached as Exhibit 12**. Unfortunately for the investigators, however, the temporary tag number was not discernable, so there was no means of identifying the vehicle using traditional means (such as a query of Ohio Bureau of Motor Vehicles ("BMV") records):



*Id.* (yellow circle added for explanatory purposes). There were also, apparently, no fingerprints left at the scene or other leads that police could follow up on. In short, in this case, it was ALPR cameras or bust, and it was not until investigators in this case used ALPR cameras located in various locations in and around the Cleveland area that they were able to identify a specific vehicle associated with Mr. Sturdivant.

Using these systems, the Bureau of Alcohol, Tobacco, Firearms, and Explosives' Industry Operation Intelligence Specialist ("IOIS") Michael Thrush queried "several" law enforcement databases, including both parts of the local ALPR system, *id.* at p. 6, but this search was not just of Mr. Sturdivant's location information. Based on the search records produced in discovery, it was a search of *every* black Chevrolet in the ALPR databases and *every* black vehicle with temporary tags or no plates. ***See* Willoughby OH PD Flock Audit, attached as Exhibit 13**. In other words, a single investigator searched the location data of thousands of people without any sort of judicial supervision or even any requirement that he coordinate with prosecutors or his supervisors before doing so. Mr. Thrush ran these broad searches across more than 1,000 ALPR cameras in at least ***three*** states and obtained hits on a suspect vehicle (which the government has allegedly tied to Mr. Sturdivant) from 22 separate ALPR cameras. *See* Exhibits 10 and 12. Those hits included queries to both the ELSAG and Flock camera databases and were the primary basis for a later warrant to search Mr. Sturdivant's vehicle and other property, as well as for a search of his phone used to gather additional location data.

While the log turned over by the government shows a list of search terms used in querying the systems, it remains unclear exactly how many vehicles the searches identified, as the government has advised the reports of the search results were not saved. *See* Exhibit 12. As a result, the government was unable to provide the results of ALPR searches, *e.g.*, how many results

came up, what those results were, and the match percentage of the results. What we do know is that through these ALPR queries (and *only* through these queries), law enforcement ultimately identified a black Chevrolet Camaro with a white bumper sticker on the lower right side of the rear bumper bearing Ohio temporary license plate number N472040. Based solely on this ALPR information, investigators developed Mr. Sturdivant as a suspect in this case and eventually obtained additional evidence allegedly connecting Mr. Sturdivant to the crimes charged in the Indictment. For example, it located his car and his girlfriend as well as Mr. Sturdivant himself, each of which resulted in additional information the government claims ties Mr. Sturdivant to the crime. The government did not pursue and has yet to reveal any other leads that would have led to Mr. Sturdivant or connected him to the robberies at issue in this case.

After obtaining the ALPR information, the government obtained Federal Search and Seizure Warrants for Mr. Sturdivant's vehicle (NDOH Case No. 1:21-mj-3323-TMP), residence (NDOH Case No. 1:21-mj-3322-TMP), and cellular telephone (NDOH Case No. 1:22-mj-3010-TMP). However, the vast majority of the probable cause for the warrants is taken up with descriptions of the robberies and the ALPR information, and the few additional facts included about Sturdivant were all derivative of the ALPR search and not especially probative of his involvement in the robberies. ***See* Search Warrant Affidavits for Mr. Sturdivant's vehicle, residence, and cellular telephone, attached as Exhibits 14, 15, and 16**. The use of the ALPR camera systems was, in short, ***the linchpin*** that held the government's case together and from which the rest of the investigation flowed.

The identification of Mr. Sturdivant and the investigation into him began with the warrantless dragnet search of ALPR location information, which led to the identification of Mr. Sturdivant as a suspect and culminated with the physical search of his home, vehicle, and cellular

telephone. Therefore, all evidence obtained in this case flowed from the initial illegal, warrantless search of his ALPR records, and therefore all evidence obtained in this case must be suppressed.

## III.    ARGUMENT

The government's search of Mr. Sturdivant's location information—along with the location information of every other person travelling through Ohio and beyond—was a warrantless dragnet search violative of the Fourth Amendment. This Court should therefore suppress all ALPR evidence in this case along with the "fruits" of the ALPR search, *i.e.* Mr. Sturdivant's vehicle identification number and registration information and the subsequent information obtained from the searches of his vehicle, his home, and his cellular telephone and its location data. Furthermore, because the government has no evidence against Mr. Sturdivant that is not tainted by its unlawful ALPR searches, this Court should also dismiss the charges against him.

### A.    Querying Comprehensive Location Surveillance Systems Operated by Third Parties is a Search Requiring a Warrant.

To begin with, the government needs a warrant to query ALPR data because such queries are a search under the Fourth Amendment. That much is obvious under both the Supreme Court's longstanding and more recent Fourth Amendment jurisprudence.

#### 1.    Mr. Sturdivant Has a Reasonable Expectation of Privacy in His Historical Location Information.

The Fourth Amendment generally forbids the government to either search or seize papers or property without first obtaining a warrant based on probable cause. U.S.Const. amend. IV. A search occurs when the government either (1) invades "a justifiable, a reasonable, or a legitimate expectation of privacy," or (2) "unlawfully, physically occupies" or interferes with the possession of "private property for the purpose of obtaining information." *See Free Speech Coalition, Inc. v. Att'y Gen.*, 677 F.3d 519, 543 (3d Cir. 2012); *United States v. Jones*, 565 U.S. 400, 404–08 & n.5

(2012). A seizure, by contrast, occurs "when there is some meaningful interference with an individual's possessory interests in [his] property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

The prevailing *Katz* test defines a search as a government action that invades a person's reasonable expectation of privacy. *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). An expectation of privacy is reasonable where a person has "an actual or subjective expectation of privacy in the subject of the search or seizure," and that "expectation of privacy is objectively justifiable under the circumstances." *Free Speech Coalition*, 677 F.3d at 543.

The Supreme Court has repeatedly affirmed citizens have a reasonable expectation of privacy in their movements over time. *Carpenter*, 585 U.S. at 310. Further, a person does not surrender all Fourth Amendment protection by venturing into the public sphere. *Id*. Individuals maintain a reasonable expectation of privacy in their movement over extended periods of time— even when traveling on open roads and in public view. *See Id.* (citing *Jones*, 565 U.S. at 430 (Alito, J., concurring); *id.* at 415 (Sotomayor, J., concurring). But this understanding even pre-dates *Carpenter*. After all, five justices agreed in *United States v. Jones* that "longer term GPS monitoring impinges on a person's expectation of privacy." 565 U.S. 400, 430 (Alito, J., concurring); *id.* at 415 (Sotomayor, J., concurring). The *Carpenter* majority deepened that understanding, highlighting the extent to which cellular telephones provide "an all-encompassing record of the holder's whereabouts," and such a "deep repository of historical location information" that it opens "an intimate window into a person's life." 585 U.S. at 311. And as the Fourth Circuit explained, and this case illustrates, "it is almost always possible to identify people by observing even just a few points of their location history." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, at 343 (4th Cir. 2021).

Like GPS monitoring and cell-site location data, ALPRs "may collect information about your activities that you may not want the government to keep a record of: where you slept last night, what gun stores you go to, what mosque you attend, what doctor you visit, what sex-toy shop you like, what marijuana dispensary you frequent, or what gay bar you prefer." Farivar, *supra*, at 86. Thus, they too implicate our reasonable expectation of privacy in our movements. Indeed, there appears to be no limit on the uses of ALPR data; for example, the American Civil Liberties Union of Northern California obtained records through a Freedom of Information Act lawsuit showing that the U.S. Immigration and Customs Enforcement ("ICE") is using license plate reader data to target immigrants.[13] Data from 2019 shows that ICE has access to over 5 billion data points of location information collected by private businesses as well as an additional 1.5 billion records collected by law enforcement agencies.[14]

The result of ALPR technology is that every day people traveling through Northeast Ohio and beyond are being monitored in their everyday comings and goings. This data is stored for an extended period (by policy, 30 days for Flock and 265 days for Selex) and is accessible to nearly every law enforcement agent at their discretion—allowing them to piece together a detailed chronical of individual's daily movements and "an all-encompassing record of the holder's whereabouts" uncovering "an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations." *Carpenter,* 585 U.S. at 311.

---

[13] *Documents Reveal ICE Using Driver Location Data From Local Police for Deportations*, American Civil Liberties Union (March 13, 2019), available at https://www.aclu.org/news/immigrants-rights/documents-reveal-ice-using-driver-location-data (last visited Sept. 30, 2024).

[14] *Id.*

Worse still, unlike in *Carpenter*, the government need not even issue a subpoena to access this information—which would at least raise the prospect that some independent third party might push back on overly broad requests. Here, the surveillance is done by government contractors and cameras for the government and can be accessed at the click of a button. No third-party participation required. No third party scrutiny involved.

In Mr. Sturdivant's case, the government did exactly that. His vehicle, along with all other vehicles, was systemically and comprehensively tracked. Using this information, and additional information derived directly from the ALPR information, law enforcement was able to retroactively create a detailed analysis of his travel, as evidenced by the government's 131-page PowerPoint presentation comprehensively tracking his alleged movements using ALPR cameras, public surveillance camera footage based on those ALPR hits, and cellular telephone geolocation data. *See* Exhibit 10. Further, while the series of robberies occurred between December 5, 2021, and December 26, 2021, the government has produced evidence in discovery showing ALPR scans of Mr. Sturdivant's vehicle going all the way back to November 13, 2021—***three weeks before any of the crimes had even occurred***. ***See* ELSAG Camero Scans, attached as Exhibit 17.** Storing that much location information and accessing that information without a search warrant is an obvious and significant invasion of every citizen's reasonable expectation of privacy, not just Mr. Sturdivant's.

### 2. The Collection and Retention of ALPR Data is Automatic, Indiscriminate, and Inescapable.

The government may argue the movements of a person travelling in public are fully exposed and therefore citizens have no expectation of privacy in their public movements. But such an argument would be an oversimplification of the law. There is no question that individuals do not have a right to privacy in what they *knowingly* expose to the public. "[T]he Fourth Amendment

protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection . . . ***But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected***." *Katz*, 389 U.S. at 351 (emphasis added). Yet *Carpenter* teaches us that this rule is not universal or automatic, especially where users have no real choice but to expose their private information. 585 U.S. at 310 ("A person does not surrender all Fourth Amendment protection by venturing into the public sphere. . . . Prior to the digital age, law enforcement might have pursued a suspect for a brief stretch, but doing so 'for any extended period of time was difficult and costly and therefore rarely undertaken.'" (quoting *Jones*, 565 U.S. at 429 (Alito, J., concurring)). Just because a person travels the public roads—all but a necessity to function in society—does not mean that they are knowingly exposing their private affairs, including, for all intents and purposes, all or nearly all of their comings and goings, their destinations, their associations, and the implications that can be drawn therefrom.

Like the cellular site location information in *Carpenter* which the Supreme Court held was Fourth Amendment protected*,* this ALPR data was collected automatically and indiscriminately, without a connection to any particular investigation, suspect or crime. Thus, "this newfound tracking capacity [of searching ALPR data] runs against everyone," which is precisely the type of warrantless governmental intrusion that was rejected by *Carpenter,* 585 U.S. at 312. Similarly, the collection of ALPR data is indiscriminate by design and captures images of every passing vehicle. ALPR data is retained and added to large databases regardless of whether the individual driving the vehicle is implicated in a crime or doing anything suspicious. And there it sits, an eerily precise record of a citizen's movements simply waiting for the government to need it, all on the

17

**assumption** that some or all of them will at some point commit a crime or otherwise become interesting to the government.

Collection is also inescapable. Like cellular telephone users exposing their information to phone companies, drivers are not voluntarily turning over their location data to private companies or to law enforcement in any meaningful sense. To exist and participate in society, individuals need to leave their homes and travel the public roads. Because every driver is required by law to have a license plate, individuals have no ability to opt out of ALPR surveillance. In *Carpenter*, the Supreme Court noted cellular telephones are "almost a 'feature of human anatomy.'" *Carpenter*, 585 U.S. at 311, quoting *Riley v. California*, 573 U.S. 373, 385 (2014). Car ownership is almost as ubiquitous as cellular telephone ownership in the United States.[15] Just as much of the population owns a cellular telephone, much of the population owns a car as well. The Ohio Bureau of Motor Vehicles reports that as of 2021, there were 12,883,368 vehicle registrations issued and 8,616,634 licensed drivers in the State of Ohio.[16] And all of these eight million plus drivers in Ohio—as well as the millions of other drivers across the United States—can have their location data systematically tracked, stored, and analyzed by the government.

Using ALPR readers, every time a car travels the public roads, the government is automatically and indiscriminately tracking that driver's movements, and drivers, if they wish to utilize the public roadways, cannot escape this monitoring. As the Supreme Court noted in

---

[15]  Pew Research Center Mobile Fact Sheet, published January 31, 2024, available at https://www.pewresearch.org/internet/fact-sheet/mobile/ (last visited Sept. 30, 2024) ("The vast majority of Americans – 97% – now own a cellphone of some kind.") and Forbes Advisor, *Car Ownership Statistics 2024,* updated March 28, 2024, available at https://www.forbes.com/advisor/car-insurance/car-ownership-statistics/ (last visited Sept. 30, 2024) ("Most U.S. households (91.7%) had at least one vehicle in 2022 (the latest data available) . . .").

[16]  Ohio Bureau of Motor Vehicles 2021 Facts & Figures, revised February 22, 2022, available at https://bmv.ohio.gov/links/bmv_2021-Facts-Figures.pdf (last visited Sept. 30, 2024).

*Carpenter*, a person does not surrender all Fourth Amendment protection by going out into the public:

> Prior to the digital age, law enforcement might have pursued a suspect for a brief stretch, but doing so "for any extended period of time was difficult and costly and therefore rarely undertaken." For that reason, "society's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply could not—***secretly monitor and catalogue every single movement of an individual's car for a very long period***." . . . Allowing government access to cell-site records contravenes that expectation.

*Carpenter,* 858 U.S. at 310-11. (cleaned up) (emphasis added). The government's usage of ALPR data similarly contravenes the people's expectation of privacy. Through ALPR technology, which continues to advance to become more and more invasive, the government can already secretly monitor and catalogue every single movement of an individual's car for a significant period of time—30 days with Flock, but up to a full year with ELSAG, per the County's policy.

Drivers may not have an expectation of privacy when it comes to isolated observations of their license plate or vehicle registration while driving on public roads, which is more analogous to driving past a stationary cruiser. *See United States v. Miranda-Sotolongo*, 827 F.3d 663, 667 (7th Cir. 2016) (citing cases); *see also United States v. Matthews*, 615 F.2d 1279, 1285 (10th Cir. 1980). But Mr. Sturdivant's case presents an entirely different scenario: the ALPR surveillance network here, and the way it was used in this case, is not an isolated reading or input of a license plate into a database. Comparing a single reading of a plate to a proactive and retroactive search of hundreds of thousands of people's location information is like comparing "a ride on horseback… [to] a flight to the moon. Both are ways of getting from point A to point B, but little else justifies lumping them together." *Riley*, 573 U.S. at 393.[17]

---

[17] This is not to say that ALPR searches are *per se* unconstitutional if they are not accompanied by a warrant. Not at issue in this case are searches police might conduct if they have a suspect

Thus, the question for this Court is not whether there is a right to privacy in the isolated observation of a plainly visible license plate on a public road; rather, the question is "whether people have a reasonable expectation of privacy that is violated when the Government, without any basis whatsoever to suspect them of any wrongdoing, collects, and stores for . . . years their [license plate location data] for purposes of subjecting it to high-tech querying and analysis without any case-by-case judicial approval." *Klayman v. Obama*, 957 F.Supp.2d 1, 37 (D.D.C. 2013). The vast network of cameras and accompanying database of location information that make up an ALPR system "has afforded law enforcement a powerful new tool . . . [which also] risks Government encroachment of the sort the Framers, 'after consulting the lessons of history,' drafted the Fourth Amendment to prevent." *Carpenter*, 585 U.S. at 320 (quoting *United States v. Di Re*, 332 U.S. 581, 595 (1948)). And that new tool entirely changes the Fourth Amendment analysis.

While individuals should expect they will be seen by the public and law enforcement when they travel the public roadways, they almost certainly do not expect that their location data is being tracked, stored, and analyzed without a warrant, for any reason or no reason. Mr. Sturdivant was not knowingly exposing his travels outside the home, nor is it likely that the public is knowingly exposing a log of their *detailed* movements, both in *real time and retroactively*. Thus, Mr. Sturdivant did not voluntarily turn over his location history to these camera companies, and his Fourth Amendment protection is not destroyed merely because he drove his car on the public roadways.

---

in mind, gather his license plate number from the BMV, and run a search for that vehicle— especially if they already have an arrest warrant in hand.

### 3. ALPR Data is Even More Precise than Cellular Site Location Data.

Similarly, the government may claim that the data collected by the ALPR system in this case is not granular enough to make querying that data a search. But the fact there may be gaps in coverage or that data may not be minutely precise as to location is not fatal to a Fourth Amendment claim. Indeed, the cellular telephone location data in *Carpenter* had significantly larger gaps than the ALPR system in this case. In *Carpenter*, the cellular telephone tower data it could only place a suspect **somewhere** (in fact, **anywhere**) within a wedge-shaped area ranging from an eighth to four square miles in size. 585 U.S. at 312; *see also Leaders of a Beautiful Struggle*, 2 F.4th at 342–43. The ALPR data here, on the other hand, undisputedly pinpoints a car at a specific intersection, in a particular neighborhood, down to the second.[18]

In other words, while the system at issue in *Carpenter* could tell the police whether a suspect was in Rocky River, Ohio or Westlake, Ohio, the ALPR system here can tell the police whether that same suspect passed through the intersection of Detroit Road and Crocker Road, in the Crocker Park shopping center, in Westlake, Ohio. To say that this system is an upgrade from the location data in *Carpenter* is thus something of an understatement, akin to saying that an Apple iPhone is an upgrade from a rotary telephone.

From there, as with the drone-surveillance system at issue in *Leaders of a Beautiful Struggle*, police can cross reference data with myriad other surveillance systems, such as systems designed to detect gunshots, standard surveillance cameras, and more. This further deepens the scope and seriousness of the privacy intrusion involved in an ALPR query. *Id*. at 344–45; see also *Carpenter*, 565 U.S. at 312 ("From the 127 days of location data it received, the Government could,

---

[18]  With technology evolving at its current pace, if ALPR cannot already, it will likely soon be able to identify more than just vehicles, to include people and faces. Indeed, the city of Cleveland has taken inconsistent positions on whether their system includes facial recognition.

in combination with other information, deduce a detailed log of Carpenter's movements . . . "). Much like the City of Baltimore, the City of Cleveland also employs a ShotSpotter gunshot detection system, and as of 2022, law enforcement alone operated more than 1,500 surveillance cameras in the city (without even beginning to count those operated by private parties).[19]

In short, the data collected by the Cleveland-area ALPR system is similarly—if not more—comprehensive than the data collected in *Carpenter* and *Leaders of a Beautiful Struggle.* For example, as in those cases, ALPR data allows law enforcement to travel back in time to track a suspect's movements even before law enforcement knew who they were looking for (or perhaps even before a crime was committed) only because it is the equivalent of "attach[ing] an ankle monitor" to every person in the greater-Cleveland area. *Leaders of Beautiful Struggle*, 2 F.4th at 341–42 (quoting *Carpenter*, 585 U.S. at 312). "Whoever the suspect turns out to be," they have "effectively been tailed" for at least 30 days (in the case of Flock cameras) or an entire year (in the case of ELSAG cameras). *Id.* at 341–42.

Indeed, the invasion here is greater than the invasion in *Carpenter* because the government itself (albeit through third-party contracts) is doing the collecting. As the Fourth Circuit explained when discussing the drone-surveillance system in Baltimore in *Leaders*, "[o]nly by harvesting location data from the entire population" could the law enforcement officers in this case "ultimately separate the wheat from the chaff" to develop a list of suspects. *Id.* at 347. Indeed, in that case, law enforcement planned to retain only 45 days of data, compared with the year of data Cuyahoga County apparently maintains for ELSAG cameras.

---

[19] Rachel Dissel and Mark Puente, *Cleveland Has Spent Millions on Police Cameras. Why are the Locations a Secret?*, The Marshall Project (filed Sept. 28, 2022, 6:00am EDT), available at https://www.themarshallproject.org/2022/09/28/cleveland-has-spent-millions-on-police-cameras-why-are-the-locations-a-secret (last visited Sept. 30, 2024).

For all these reasons, requiring a warrant is necessary to preserve historical levels of privacy. As the Supreme Court explained in *Carpenter*,

> We decline to grant the state unrestricted access to a wireless carrier's database of physical location information. In light of the deeply revealing nature of CSLI, its depth, breadth, and comprehensive reach, and the inescapable and automatic nature of its collection, the fact that such information is gathered by a third party does not make it any less deserving of Fourth Amendment protection.

585 U.S. at 320. The same should hold true here. Indeed, as Justice Alito suggested with respect to the much more targeted GPS tracker in *Jones*, "it is almost impossible to think of late–18th-century situations that are analogous to what took place in this case. (Is it possible to imagine a case in which a constable secreted himself somewhere in a coach and remained there for a period of time in order to monitor the movements of the coach's owner?" *Jones*, 565 U.S. at 420 (Alito, J., concurring.) Indeed, any contrary suggestion is ridiculous, requiring "either a gigantic coach, a very tiny constable, or both—not to mention a constable with incredible fortitude and patience." *Id.* at 420 n.3. In this case, in fact, law enforcement would require either an army of Lilliputian constables or one who could be in millions of places at once, since law enforcement is tracking not just one but all of us.

### B.    As with Cellular Site Location Information, Law Enforcement Should Be Required to Obtain a Search Warrant to Access ALPR Location Information.

To be clear, this motion does not propose that the government dismantle its ALPR system. But, because querying that system is obviously a Fourth Amendment search, the warrant requirement applies when law enforcement queries ALPR data during a criminal investigation— just as the Fourth Amendment requires law enforcement to obtain a warrant before accessing cellular site location information from a private cellular telephone service provider. The purpose

of that requirement is not to frustrate investigations but to interpose some measure of independent and impartial judicial supervision to the search process.

In this case, law enforcement relied significantly on ALPR data obtained without a search warrant or any judicial supervision at all. In fact, the investigation was at a dead end until ALPR technology was utilized. Surveillance footage and witnesses identified a black car with what investigators thought were temporary tags at the scene of some of the robberies. But investigators had nothing more to go on—until law enforcement ran a general search of **all** black vehicles with no plates or temporary tags in the state of Ohio and several other states. ***See* Exhibit 12**.

In fact, the government tracked not only the license plate data of Mr. Sturdivant, but the data of every single person travelling the roadways of Ohio and beyond. In Mr. Sturdivant's case, the government ran such searches as:

- Chevrolet Black All Images
- Chevrolet Black No Plates
- Black No Plates
- All Images Temporary Tag Ohio Tennessee Georgia Indiana
- Black All Images Temporary Tag Ohio Tennessee Georgia Indiana
- All Images Ohio

*Id.*

Even more chilling is the fact that the government not only tracks this information, but that it can then employ advanced analysis of the data. ████████████████████████████████

████████████████████████████████████████████████████████

████████████). ***See* Training Deck 2020, slide no. 34**, attached as **Exhibit 18.**

The government may argue that they only search ALPR data for good reason and that individuals who are acting lawfully have no cause for concern, but there is, at present, no law to enforce any type of limitations on these searches. For example, in Kansas, a police lieutenant used

Flock license plate reader technology to stalk his estranged wife.[20] This woman, like most individuals, likely did not think that she was giving her comprehensive location information to the government merely by virtue of traveling the public roads, nor did she give this information knowingly. Just as the Fourth Amendment protects an individual's cellular site location information, so, too, should it protect automatic license plate reader location information. Further, none of the subpoenaed agencies have produced any policy that meaningfully limits the ability to search, or at least provides any meaningful oversight. More importantly, citizens are not required to rely on the government's good graces for the protection of their constitutional rights—that is what the Bill of Rights is for.

Moreover, while the government may claim some earlier cases have rejected similar arguments related to ALPR cameras, those cases are neither binding nor persuasive, as they involved far less comprehensive ALPR systems. For example, in *United States v. Rubin*, 556 F. Supp. 3d 1123, 1129-30 (N.D. Cal. 2021), the court rationalized that the system at issue was not comprehensive enough to provide "a detailed log of Rubin's movements" but it went out of its way to warn that ALPR systems might soon reach a point where they were sufficiently comprehensive to raise Fourth Amendment concerns. Likewise, the ALPR system in, *Commonwealth v. McCarthy*, 142 N.E.3d 1090, 1105 (Mass. 2020), involved only two (2) cameras capturing cars entering and exiting a major metropolitan area only over a particular bridge, rather than a ubiquitous system tracking a person's movement around the city. In Mr. Sturdivant's case, the government was in fact able to collect a detailed log of his movements using a system made up of more than 1,100 ALPR cameras and other surveillance technologies, as evidenced by the

---

[20] Joe Baker, *Kechi police lieutenant arrested for using police technology to stalk wife*, (published October 30, 2022), available at https://www.kwch.com/2022/10/31/kechi-police-lieutenant-arrested-using-police-technology-stalk-wife/ (last visited Sept. 30, 2024).

131-page PowerPoint presentation it put together comprehensively tracking his alleged movements. *See* Exhibit 10.

### C.    No Fourth Amendment Exception Applies to Save the Evidence in this Case, All of Which is a Fruit of the Unlawful Search.

There are of course a few narrowly and specifically delineated exceptions to the Fourth Amendment's warrant requirement that the government may argue. *United States v. Mallory*, 765 F.3d 373, 382 (3d Cir. 2014) ("It is a cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.") (cleaned up). However, none of these exceptions apply here. Accordingly, all evidence seized from the search locations, and all evidence derived therefrom, was illegally seized and should be suppressed. *See Wong Sun v. United States,* 371 U.S. 471, 479-480 (1963), *see also Murray v. United States,* 487 U.S. 533 (1988).

The government will likely argue, contrary to this analysis, that its evidence against Mr. Sturdivant is admissible under the inevitable discovery doctrine. That doctrine "allows admission of unlawfully obtained evidence if the government can 'establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'" *United States v. Lazar*, 604 F.3d 230, 239 (6th Cir. 2010) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)). "To establish inevitable discovery, the government must show that the evidence would have been acquired lawfully through an independent source absent the government misconduct." *Id.* The question is: "Viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred?" *United States v. Cooper*, 24 F.4th 1086, 1092 (6th Cir. 2022) (quoting *United States v. Kennedy*, 61 F.3d 494, 498 (6th Cir. 1995)).

In answering this hypothetical, the Sixth Circuit has provided several guiding principles for this Court to follow. ***First,*** while considering what would have happened absent an illegal search "inherently requires some conjecture, . . . courts must 'keep speculation at a minimum by focusing on 'demonstrated historical facts capable of ready verification or impeachment.'" *Cooper,* 24 F.4th at 1094 (quoting *United States v. Ford*, 184 F.3d 566, 577 (6th Cir. 1999)). "The risk of intolerable speculation" is especially evident where "the government's theory of discovery relies on the irregular actions of third parties." *Cooper*, 24 F.4th at 1094. ***Second,*** "[b]ecause inevitable discovery asks what would have happened had the illegality not occurred, courts may rely on post-illegality events only if it would have occurred in the counterfactual scenario." *Id.* at 1095.

Here, the government has never posited an alternative route to locating Mr. Sturdivant and it is difficult to imagine what such a path might have been. The government did not have any witnesses pre-illegal search capable of identifying Mr. Sturdivant from store surveillance footage. It had no readable license plate it could look up in the BMV records or another publicly available database. Absent some unknown deus-ex-machina dropping into the investigator's lap, there was no means of tying Mr. Sturdivant to these alleged events other than the ALPR searches this motion challenges.

Consequently, the results of those searches and all the "fruits" of those searches must be suppressed. *See Northrop v. Trippett*, 265 F.3d 372, 383 (6th Cir. 2001) ("[T]he fruit of the poisonous tree doctrine provides that evidence discovered as the indirect result of a Fourth Amendment violation is inadmissible.") In this case, that is all the evidence against Mr. Sturdivant. "The exclusionary rule 'reaches not only primary evidence obtained as direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or

'fruit of the poisonous tree.'" *United States v. Smith*, 575 F.Supp. 3d 542, 550 (E.D. Pa. 2021) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)). Thus, if officers rely on evidence or information gained from an illegal warrantless search to obtain a warrant, any evidence collected while executing that warrant must be suppressed. *See Wong Sun*, 371 U.S. at 488 (evidence is fruit of the poisonous tree if it was obtained "by the exploitation" of earlier illegal conduct); *United States v. Mitchneck*, 2 F.Supp. 225 (M.D. Pa. 1933) (holding that evidence obtained using warrant based on information from earlier illegal search must be suppressed). Should this Court determine that a search of ALPR data requires a warrant, then any evidence derived from this search much also be suppressed.

The government's investigation was for all intents and purposes at a dead end until it warrantlessly searched ALPR data. From there, the government located the vehicle registration information, which led them to Mr. Sturdivant, which in turn led to a search of his home, car, and cellular telephone, as well as to an interview of his girlfriend. Because all of this evidence resulted from the warrantless ALPR search, it should also be suppressed.

## IV.  CONCLUSION

As it currently stands, the government has unrestricted access to private databases of travel and location information on nearly every citizen in the Cleveland, Ohio area. This information is just as revealing, if not more so, than cellular site location information, and its collection is automatic and inescapable. For all these reasons, the government should be required to obtain a search warrant before querying ALPR databases. And, because all the government's evidence in this case is either the result or fruit of a warrantless ALPR search, it must be suppressed and the charges against Mr. Sturdivant should be dismissed.

Defendant Sturdivant respectfully requests an evidentiary hearing on this motion and submits that the testimony of various witnesses will be necessary for the Court to fully understand the facts and issues underlying this motion. As provided by the Amended Pretrial Order 2 (ECF No. 88), Counsel respectfully requests that at such oral argument the Court allow Defendant's counsel to bifurcate its oral argument in that the senior attorney, Paul M. Flannery will present one portion of the argument and the less experienced lawyer, Susan A. Jacobsen, who is also working on this case, presents the other portion.

Respectfully submitted,

/s/ *Paul M. Flannery*

Paul M. Flannery (OH: 0091480)
Susan A. Jacobsen (OH: 0100620)
Flannery │ Georgalis, LLC
1375 E. 9th St., 30th Floor
Cleveland, OH 44114
Tel./Fax: (216) 367-2094 (Paul)
Tel./Fax: (216) 666-2319 (Susan)
paul@flannerygeorgalis.com
sjacobsen@flannerygeorgalis.com

*Attorneys for Defendant Lawrence Sturdivant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 28, 2024, a copy of the foregoing was filed electronically.

Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

/s/ *Paul M. Flannery*
Paul M. Flannery (OH: 0091480)

*Attorney for Defendant Lawrence Sturdivant*