IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.:  1:22-CR-615 |
| | ) | |
| Plaintiff, | ) | JUDGE J. PHILIP CALABRESE |
| | ) | |
| v. | ) | |
| | ) | |
| LAWRENCE STURDIVANT, | ) | RESPONSE IN OPPOSITION TO |
| | ) | DEFENDANT'S MOTION TO SUPPRESS |
| Defendant. | ) | |

Now comes the United States of America, by and through counsel, Rebecca C. Lutzko,

United States Attorney, and Adam J. Joines and Margaret A. Kane, Assistant United States

Attorneys, to respond in opposition to Defendant Lawrence Sturdivant's Motion to Suppress All

Evidence Stemming from the Warrantless Search of His Location Data (R. 93, PageID 1345–

1678) (redacted version) (hereinafter, the "Motion")).[1]

## I.    __INTRODUCTION__

License plates are not meant to be kept private.  When people drive cars in public, they

acknowledge their cars will be seen by others.  The exterior of any car, especially its license

plate, is plainly visible for any person to see.  This is no concern for most drivers.  They

recognize that license plates allow law enforcement and others to identify cars on the road.  The

entire point of a license plate is so each vehicle displays a unique identifier that connects it to its

registrant and owner.

---

[1] Sturdivant also filed a sealed version of the Motion and exhibits, *see* R. 92, which does not
have ECF page citations.  For ease of reference, page numbers herein are to the redacted version,
R. 93.

License plates and other exterior car features also are not cell phones.  Cell phones, which owners typically carry compulsively, can passively transmit location data multiple times a minute.  These data transmit without regard to the person's presence in a public space or his private areas, such as a bedroom or doctor's office.  Because it can be gathered from anywhere and compiles thousands of points of data in a short time, cell phone location databases can be used to track the whole of a person's movements.  License plates and other external car features cannot be used the same way.  Instead, they remain attached to cars and, by extension, the roads they travel.  External car features (and by extension, cameras that photograph them) do not follow people into their bedrooms, kitchens, places of work, or doctor's offices.  Databases collecting license plate photographs of cars driving on public roads can only capture that limited part of a car's movements.  Even if both cell phone and license plate location records can be stored in searchable databases, only an analysis of the former can chronicle the totality of a person's whereabouts.

Sturdivant's Motion, however, demands that this Court illogically equate cell phone location records with records of vehicles traveling on public roads.  It claims that his Fourth Amendment rights were violated when law enforcement, while seeking to identify the suspect who used a gun to rob ten stores, queried license plate reader databases for his black Camaro without a warrant.  (R. 93: Motion, PageID 1347).  Its request necessitates this Court extending precedent the Supreme Court called "narrow."  But such an extension would be improper.  Sturdivant's rights were not violated because he has no reasonable expectation of privacy in public-facing information about his car.  Sturdivant chose to drive his car in public, thereby displaying to the world its exterior features and license information.  This itself was not strange; society expects drivers to display license tags or plates while on public roads.  He cannot claim

his private data were searched when the only information collected about his car was also available to the public.

Data from automatic license plate readers (ALPRs) cannot be used to track the totality of anyone's movement, and certainly did not do so for Sturdivant.  ALPRs use cameras to take still images of vehicles on public roads, then builds a temporary searchable database of each vehicle's license plate and other exterior identifying information.  Each photograph in the ALPRs database does no more than indicate a given vehicle is present in a single location at a moment in time.  While compilation of those pictures can indicate some details about a car's travel on public roads, that information is many degrees away from possibly violating the Constitution.  The systems do not follow the photographed car into a garage, much less pursue the driver into a home or business.  They do not identify with any regularity who the driver of a given vehicle is.  Even large numbers of ALPR hits leave law enforcement wondering where the vehicle went as it travels from one camera to the next.  This is why Sturdivant's claims that the government used a single "grain image of a black car with a temporary tag" to build a "131-page dossier of movements" (R. 93: Motion, PageID 1346) misses the mark.  Not only does that document rely on many sources unrelated to ALPR, it does not track the whole of Sturdivant's movements.

There is no question that people have reasonable expectations of privacy in the "whole of their movements." *United States v. Carpenter*, 585 U.S. 296, 311–13 (2018).  But Sturdivant's ultimate ask—that this Court equate the search for several photographs of license plates to a search for thousands of cell phone location data points—fails because he cannot show that ALPRs provide tracking of a person's every movement that requires a warrant.

For the reasons below, this Court should deny the Motion.  Sturdivant's rights were not violated when law enforcement used ALPRs to identify his car.  But even if this Court holds that an ALPR search should require a warrant (or if it chooses not to address the issue), evidence still should not be suppressed because law enforcement acted on good faith in 2021 when they conducted the ALPR query.

Sturdivant even errs in the scope of his wrongly requested suppression.  He fails to acknowledge that Sturdivant identified himself to law enforcement as the car's owner several days after the ALPR search.  He provided an independent source of the same identification data such that law enforcement still would have inevitably connected him to the robberies.  There is thus no basis for this Court to suppress any data, nor reason to "dismiss the indictment against Mr. Sturdivant."  (R. 93: Motion, PageID 1347).

## II.  **FACTS AND BACKGROUND**

### A.  **The Ten Robberies.**

From December 5, 2021, to December 26, 2021, an armed suspect robbed multiple retail stores to take money from checkout cash registers.  Witnesses and victims of the robberies provided similar descriptions of the suspect, his firearm, and similar patterns of conduct in how the robberies occurred.  Video surveillance and witness accounts also connected the suspect with a black Chevrolet Camaro with a temporary license plate tag hanging in the rear window.

#### 1.  Robbery 1 – Walgreens Store on December 5, 2021.[2]

On December 5, 2021, at approximately 4:03 P.M., the Walgreens located at 16400 Chagrin Boulevard, Shaker Heights, Ohio, was robbed.  An elderly couple in the parking lot

---

[2] Facts about the specific robberies are offered based on the investigation by Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) Special Agent Nathan Schwartz, who drafted the PowerPoint summary referenced in the Motion, Exhibit 11.  The United States attaches this same

when the robbery happened saw a male wearing all black clothing running towards Chelton Road.  They stated that they saw the male get into a black sedan and drive away.  Surveillance video from inside Walgreens at approximately 3:56 P.M. showed a tall black male with a slender build enter the store.  The video shows the male wearing a black and red winter hat, a black puffy jacket, dark colored utility pants, and black gloves.  The suspect then pointed a dark colored gun at the cashier and took money from the register.  Store surveillance video also confirmed that the suspect left to Chelton Road and drove away in a black sedan.

 2. Robbery 2 – Walgreens Store on December 5, 2021.

Also on December 5, 2021, at approximately 4:29 P.M., the Walgreens located at 11401 Union Avenue, Cleveland, Ohio, was robbed at gunpoint.  The victim reported that the male suspect entered the store at approximately 4:25 P.M. wearing all black.  He grabbed candy and approached the register.  When they opened the cash register to check out the suspect, the victim stated they saw the suspect pulled out a tan firearm with a flashlight attached to it, reached over the counter, and grabbed the cash tray from the register.  The suspect then stated "I'm not pointing the gun at you.  I just want the money to feed my family."  The suspect took the money and left the store.  Surveillance video from inside the store showed a black male wearing a black or possibly gray bubble jacket, dark pants or dickeys, and black winter gloves.  The suspect had on a full-face mask and dark colored shoes.

This Walgreens at 11401 Union Avenue is approximately 2.3 miles from the Walgreens located at 16400 Chagrin Boulevard that was robbed the same day approximately half an hour earlier.  Video surveillance equipment, which is part of Cleveland Police Department's (CPD's)

document as its Exhibit A.

Real Time Crime Center system (RTCC), showed the intersection of E. 140th St. and Kinsman Road (an intersection between the two stores) at approximately 4:02 P.M.. During the time between the two robberies, a black Chevrolet Camaro passed through. RTCC footage near the Auto Zone at 11414 Kinsman Rd, Cleveland, showed, at approximately 4:17 P.M., the black Camaro park and a black male exit the vehicle. The suspect entered Auto Zone without a face mask, and exited after approximately two minutes before he left heading south on E. 116th St. The Walgreens at 15400 Chagrin Boulevard is on the corner of E. 116th St., approximately one block farther down the road.

      3.     <u>Robbery 3 – Family Dollar Store on December 11, 2021.</u>

On December 11, 2021, at approximately 12:56 P.M., the Family Dollar located at 8404 Madison Avenue, Cleveland, Ohio, was robbed at gunpoint. Victims stated that they saw a black male, wearing a black facemask, a navy-blue jacket, gray sweatpants, and gloves enter the Family Dollar and approach the cash register. The victim stated that the suspect then pulled out a tan colored pistol, pointed it at the victim, and stated, "open the register." The victim became nervous and was unable to open the register. A second victim responded to assist in opening the register but also could not open it. The suspect became impatient and left the store empty handed, fleeing eastbound on Madison Avenue on foot.

Officers spoke with a witness who observed the suspect get out of what the witness believed was a new black Chevrolet Camaro with tinted windows and silver rims. One witness saw the male that had robbed the store exit a black Camaro near W. 83rd and Madison Avenue.

      4.     <u>Robbery 4 – Family Dollar Store on December 11, 2021.</u>

On December 11, 2021, at approximately 1:39 P.M., the Family Dollar located at 16605 South Miles Road, Cleveland, Ohio, was robbed at gunpoint. The victim described the suspect was a black male, dark complected, approximately 6' tall, slim build, wearing a black ski mask

and a gray Tommy Hilfiger puffy coat with a blue stripe on the hood.  The victim stated that the suspect placed items to be purchased on the counter and placed a $10 bill on the counter.  The victim looked down to open the register and give the male change, when the suspect pulled out a black gun with a silver barrel, pointed it at the victim and stated, "let me get that."  The victim stated the suspect took money from the register and exited the store.

This Family Dollar location is approximately 12.2 miles from the Family Dollar located at 8404 Madison Avenue, Cleveland, Ohio, 44102 that was robbed the same day approximately forty minutes earlier.

     5.    <u>Robbery 5 – Walgreens Store on December 16, 2021.</u>

On December 16, 2021, at approximately 7:23 A.M., the Walgreens located at 3415 Clark Avenue, Cleveland, Ohio, was robbed at gunpoint.  The victim escribed the suspect as a black male, dark complected, approximately 6' tall, skinny, wearing a black "bubbly" coat, black jeans, black shoes, black mask, and a black baseball cap with white "Chipotle" writing along the side.  The victim stated that the suspect entered the Walgreens, grabbed a bag of Kit Kats, and went to the register.  The suspect placed the candy and $5 on the counter while the cashier opened the cash register.  The suspect pulled out a tan handgun with a tactical light attachment, leaned over the counter, pointed the gun at the victim and stated "be cool" approximately five times while the suspect started grabbing money.  The suspect stole money and left the store heading southbound on Fulton Road.

After this robbery, a witness flagged down responding officers to tell them that the suspect vehicle was parked in the parking lot of the Walgreens.  The witness provided police with dash camera from his vehicle that showed the suspect walking in and then running out of the store.  The witness stated that the suspect walked into the store coming from the west side of the Walgreens and ran out that direction a few minutes later.  The witness stated that the suspect

fled in a dark colored sedan that was parked on Fulton Road.  Police reviewed additional surveillance footage from the area, some of which showed the suspect Camaro drive into and then leave the Marathon Gas Station located at 3106 Fulton Road before traveling southbound on Fulton Road where it parked close to the Walgreens described above.  Together, videos show the suspect walk from that vehicle to the Walgreens, conduct the robbery, then run back to the vehicle.

During a follow up to this investigation, a CPD detective reviewed RTCC footage of the intersection at Clark Avenue and Fulton Road.  He observed the suspect enter the Walgreens at approximately 7:20 A.M., then exit the Walgreens at approximately 7:22 A.M.  The footage also shows the suspect black Camaro with a temporary license plate hanging in the rear window of the vehicle and a black and white bumper sticker on the lower right side of the rear bumper.  He also reviewed footage from the Marathon gas station, which shows the same suspect car with those rear end features.  Below is a screenshot from the video taken from the Marathon gas station at 3106 Fulton Road, which shows the suspect car.



Officers used this image to query license plate reader systems, which is discussed in more detail in Section II.B.2, below.

6.     <u>Robbery 6 – CVS Store on December 16, 2021.</u>

On December 16, 2021, at approximately 8:14 A.M., the CVS located at 8000 Euclid Avenue, Cleveland, Ohio, was robbed at gunpoint.  The victim stated that the suspect was a black male, approximately 6' tall and thin, wearing a black hat, black puffy jacket, black mask, and black gloves.  The victim stated the suspect walked up to the register to buy Pringles.  The victim opened the register, and the suspect pulled a pistol from his right jacket pocket pointed the pistol at the victim and stated, "I don't want to shoot you."  The victim stepped aside, and the suspect emptied the contents of the cash drawer.  The suspect then fled the store and headed south bound on East 79th Street.

RTCC footage showed the suspect again entering a black Camaro, with no visible license plate, parked behind a church on the southwest corner of Euclid Avenue and East 79th Street.

9

The suspect fled southbound on East 79th Street to Cedar Avenue, westbound on Cedar Avenue to East 78th Street, then southbound on East 78th Street.  This CVS is approximately 6 miles from the Walgreens located at 3415 Clark Avenue that was robbed the same day approximately fifty minutes earlier.

       7.      <u>Robbery 7 – Family Dollar Store on December 18, 2021.</u>

On December 18, 2021, at approximately 8:58 A.M., the Family Dollar located at 3470 East 93rd Street, Cleveland, was robbed at gunpoint.  Victims described the suspect as a black male, approximately 6' tall, with a thin build, wearing a black bubble jacket, black pants, black shoes, a black baseball cap with "Chipotle" stitched on the front, and a blue medical mask covering his face.  The victims stated the suspect presented a green, black, and brown handgun with a laser attached and stated, "I don't want to hurt nobody, but I will" and demanded money from the register.  The victims removed the money from the register and handed it to the male, who observed a stack of the $1.00 bills contained a tracker. The suspect removed the bills and tracker and placed it on the counter with the register.  The second victim was having trouble with the second register drawer at which time the male suspect took the drawer from the victims' hands and left with the drawer and its contents through the store's front doors.

       8.      <u>Robbery 8 – Family Dollar Store on December 26, 2021.</u>

On December 26, 2021, at approximately 10:10 A.M., the Family Dollar located at 11511 Kinsman Avenue, Cleveland, Ohio, was robbed at gunpoint.  The victim stated that the suspect was a black male, wearing a black jacket, black hat, black face mask, black shoes, a black glove on his right hand and gray joggers.  The suspect approached the cash register and pulled out a "camo designed handgun with a beam on it" and demanded all the money in the register.  The victim complied and the suspect leaned over the counter, without touching anything, and grabbed

the money.  The victim stated the suspect exited the Family Dollar and went northbound on East 116th Street.

RTCC footage from the cameras located at the intersection of East 116th Street and Union Avenue showed a black Chevrolet Camaro with black custom rims driving up and down East 116th Street, and a male, matching the description of the suspect, exiting the vehicle and returning to the car right after the Family Dollar robbery.

9.      Robbery 9 – Family Dollar Store on December 26, 2021.

On December 26, 2021, at approximately 11:00 A.M., the Family Dollar located at 4172 Pearl Road, Cleveland, Ohio, was robbed at gunpoint.  The victim stated the suspect was a black male, wearing a black puffy winter jacket, gray sweatpants, black shoes, and a black face mask. The suspect came in the store and put a bag of M&M's down on the counter and a $5 bill.  The victim opened the cash register, then the suspect pulled out a "gold or metallic" 9mm handgun and demanded the money in the register.  The suspect took money, told all employees to go to the back of the store, then fled out the front door of the store.

Officers reviewed the store surveillance video and saw the suspect walk in the store at approximately 10:51 A.M., pull out the gun at approximately 10:52 A.M., and leave the store at approximately 10:53 A.M. before fleeing westbound down Broadview Road on foot.  This Family Dollar is approximately 7.4 miles from the Family Dollar located at 11511 Kinsman Avenue, Cleveland, that was robbed the same day approximately forty-five minutes earlier.

10.      Robbery 10 – Family Dollar Store on December 26, 2021.

On December 26, 2021, at approximately 11:45 A.M., the Family Dollar located at 7301 Detroit Avenue, Cleveland, Ohio, was robbed at gunpoint.  The victims stated that the suspect approached them at the cash register.  The victims described the suspect as a black male, approximately 5'11" tall, thin build, wearing a dark blue puffy coat, a black face mask, black

11

shoes, a black glove on his right hand, gray Nike jogger pants, and black shoes.  The victims stated the suspect pulled out a tan colored semi-automatic handgun with a black weapon light on it and demanded all the money in the register.  The victims complied and the suspect leaned over the counter, without touching anything, and grabbed the money with his left gloved hand. The victims stated the suspect then told them to walk towards the back of the store while the suspect then ran out the front door of the store and headed northbound on West 73rd Street.

The Family Dollar located at 7301 Detroit Avenue, Cleveland, is approximately 4.3 miles from the Family Dollar located at 4172 Pearl Road, Cleveland, that was robbed the same day approximately forty-five minutes earlier.

**B.      Law Enforcement Identifies Sturdivant as the Camaro's Registered Owner.**

On December 20, 2021 (after the seventh robbery), SA Schwartz began investigating the robberies connected by the modus operandi of the robber, locations and proximity to each other, and similar descriptions of the suspect and black Camaro.  Shortly after, SA Schwartz requested that ATF Industry Operation Intelligence Specialist (IOIS) Michael Thrush assist in querying several law enforcement databases toward trying to locate the suspect black Camaro.  IOIS Thrush queried a database that used data from both Flock Safety (Flock) and Leonardo (ELSAG) ALPR systems, each of which has a series of license plate reader cameras attached on fixed location, such as telephone or light poles, around Cleveland and other areas.

1.      ALPR Systems in Cuyahoga County.

In December 2021, law enforcement in Cuyahoga County had two main ALPR system providers:  Flock and Leonardo (ELSAG), which operates fixed cameras like Flock.  Flock ALPRs work by photographing moving cars using fixed motion-capture cameras mounted on utility poles.  The Falcon model, which is used in Cuyahoga County as installed by Flock, is a stationary camera affixed to a pole without zoom, tilt, pan, audio, or video capabilities.  The

cameras are typically deployed on public roadways and capture the rear of vehicles as they travel.  In 2021, Newburg Heights had 8 Flock cameras, Highland Heights had 1, and Brooklyn had 12.  In 2021, CPD did not have access to Flock.  As of today, Newburg Heights has 16 Flock cameras, Highland Heights has 3, and Brooklyn has 16.  Across the whole of Cuyahoga County today, there are 1,636 Flock cameras, including some cameras in Cleveland that CPD can access.  Flock installed these cameras after reviewing heat maps showing streets with the highest traffic levels.[3]

When a car passes by a Flock camera, it takes a photograph that uploads to a cloud database.  Flock technology makes the image searchable by identifying features of the car.  This includes reading the vehicle's license plate and attempting to identify the car's make, model, body, and color.  The software also attempts to identify special identifiers like bumper and window stickers, roof racks, and toolboxes.  Each of these external features is searchable.  *See* (Example screenshots of Flock's interface, attached hereto as Exhibit B).

Law enforcement can search Flock using these scanned parameters to identify and return photographs of cars within the last 30 days.  Photo results show the date, time, and location of the license plate photograph.  Photographs returned also crop to the rear of the car where the license plate sits, which typically avoids showing law enforcement sweeping photos of buildings, sidewalks, and houses adjacent to the road.  They do not show the driver (except incidentally) or other features inside the car.  The system does not allow for facial recognition; if a Flock camera

---

[3] In addressing ALPR issues, one court in Virginia noted with respect to installation that "[t]he Flock cameras are 'strategically' placed to capture images of <u>locations</u>, not <u>individuals</u> . . . ." *United States v. Martin*, No. 3:23-CR-150, 2024 WL 4476560, at *14 (E.D. Va. Oct. 11, 2024) (emphasis in original).  Cuyahoga County cameras were installed in a similar fashion.

inadvertently photographs a person's face, there is no mechanism to search for that photograph. Flock only retains data for Cuyahoga County cameras in its ALPR system for 30 days.

ELSAG cameras work like those installed by Flock.  ELSAG photographs return the rear area of the car aimed primarily at its license plate.  Law enforcement can search these photographs by license plate or external car features.  CPD officers do not have direct control over ELSAG cameras, which are maintained by either Cuyahoga County or Chagrin Valley Dispatch.  According to the Motion, ELSAG retains data for 265 days.[4]  The ALPR system that IOIS Thrush queried provided information from both Flock and ELSAG.

> 2. Law Enforcement Uses Flock's ALPRs to Read the Black Camaro's License Plate and Identify Sturdivant as the Registered Owner.

IOIS Thrush queried Flock ALPR for a black Chevrolet coupe with a temporary license tag and a bumper sticker.  After reviewing results, he identified a car with the same appearance as the black Chevrolet Camaro seen by witnesses and that appeared in the Marathon gas station surveillance footage following Robbery 5.  See below for the comparison of those two images:

---

[4] As the time of filing, the United States has been unable to verify whether this retention period is correct.  It is working with local law enforcement who has access to ELSAG to determine its accuracy.



Marathon Gas Station Photo



Flock Camera Photo

Both photographs show a similarly placed temporary tag and black-and-white bumper sticker on

the rear right bumper.  Although law enforcement already suspected this Camaro given its

description by witnesses and appearance in video connected to at least six of the robberies, the

Flock ALPR photograph provided the temporary tag license plate number N472040.  With this new information, IOIS Thrush queried the National Crime Information Center system for Ohio temporary license plate number N472040.  IOIS Thrush and SA Schwartz identified the registered owner as Lawrence D. Sturdivant.  Per the Ohio Law Enforcement Gateway (OHLEG), Sturdivant was further described as a black male, 5'11" 190 pounds.  This description matched those given by witnesses and victims of the robberies described above.  Law enforcement also spoke with Sturdivant's parole officer, who confirmed his address, stated he worked at Chipotle (the robber sometimes wore a Chipotle hat), and recently bought a newer black Chevrolet Camaro.  In total, law enforcement focused on approximately 22 ALPR data points showing the suspect Camaro driving around Cuyahoga County between November 25 and December 26, 2021.  *See* (Timeline Spreadsheet, attached hereto as Exhibit C).

> C.      **Sturdivant Reports His Car Stolen and Officers Recover the Black Camaro.**

At 10:06 P.M. on December 26, 2021 (the same day as the last three robberies and before law enforcement executed any search warrants or arrested him), Sturdivant contacted CPD to report that his black Camaro was stolen earlier in the morning around East 55th Street and Cedar Avenue.  Sturdivant stated that the suspect was a black male, wearing a "puffy jacket" and weighed approximately 240 pounds.  He stated that the male was armed with a gold gun with stars on it and that he hit him with the gun.  Sturdivant stated that he did not call in the morning when it happened because he wanted to "handle it in the streets."  The responding CPD officers toured the area but could not take a full statement because Sturdivant did not make himself available.  The incident was documented in CPD report no. 21-00388885, attached hereto as Exhibit D.

A few hours later on December 27, 2021, CPD Officers located Sturdivant's black Camaro near East 53rd Street and Fleet Avenue.  This is approximately one street over from

Sturdivant's girlfriend's home. While on scene, a witness approached the officers and stated that about two hours before they arrived, he observed a black male, 5'11" with a thin build and wearing a black jacket park the vehicle. The witness stated that, after the male parked the vehicle, he walked southbound on East 53rd Street, then eastbound on Fleet Avenue. Police noticed that the car did not contain many items and it appeared to have been cleaned recently. Sturdivant's DNA was later found on the steering wheel, gear shift, and driver's door handle. All this information confirmed that Sturdivant was the owner and driver of the black Camaro.

SA Schwartz obtained surveillance video from a building at 5401 Fleet Avenue, which is a block from where the car was found. SA Schwartz learned previously that Sturdivant's girlfriend, Tamika Carter, lived on East 54th Street. The video captured footage toward this residence and showed a series of events in the evening of December 26, 2021 from approximately 8:56 P.M. until 10:28 P.M. (before and immediately after Sturdivant reported the car as stolen):

- Sturdivant pulled his car in the driveway at 3728 East 54th Street, which appeared to be vacant and close to Carter's home.
- Sturdivant cleaned his car. Video shows Sturdivant taking items out of his car and putting them into a second car parked on the street.
- Sturdivant drove the car out of the driveway and southbound on East 54th Street, then westbound on Fleet Avenue.
- Sturdivant walked back on foot from the direction he came (eastbound on Fleet, then northbound on East 54th) and entered Carter's residence on East 54th Street.

Based on this footage, officers believed that Sturdivant falsely reported his Camaro as stolen.[5]

---

[5] The United States is aware that, on or before December 26, CPD patrol officers attempted to traffic stop a black Camaro because they were aware that that type of car was involved in the robberies. It is unknown whether those CPD officers knew the license plate number from IOIS Thrush's ALPR query. The CPD patrol officer informed SA Schwartz that neither Sturdivant nor his car were identified during the attempted stop and that the suspect car fled before the stop could be completed. Because there was no stop, the officer did not write a report. It is unclear whether this attempted stop played any role in Sturdivant's false stolen car report.

**D.**     **Law Enforcement Arrests Sturdivant and Obtains Additional Evidence Connecting Him to the Robberies.**

After recovering Sturdivant's car following his police report, on December 27, 2022, SA Schwartz obtained a federal search warrant for Sturdivant's home on Maplerow Avenue, Garfield Heights, Ohio.  On December 29, 2021, ATF agents executed the residential search warrant, during which Sturdivant was arrested on other state-issued warrants.  Sturdivant made statements on scene that he "got rid of the gun because, I wasn't trying to get caught with it and go back to prison."  Agents recovered, among other things, ammunition.

SA Schwartz also obtained evidence about Sturdivant's cell phone location and iPhone data (via federal search warrants signed January 6, 2022), Instagram and iCloud data (via federal search warrants signed April 21, 2022), and Google data (via a federal search warrant signed May 31, 2022).  SA Schwartz also worked with other agents to create a 131-page slideshow summary of Sturdivant's involvement in the robberies by using data from in-store surveillance cameras (49 slides), cell phone records (26 slides), RTCC footage (23 slides), Flock ALPRs (11 slides), Leonardo (ELSAG) ALPRs (11 slides), and Google Maps (10 slides).[6]

SA Schwartz further connected Sturdivant to the robberies by comparing photographs of his clothes on Instagram while at work with those of the robber during at least one of the robberies. *See* (Report of Investigation 19, attached hereto as Exhibit E).  He also compared Sturdivant's cell phone location records against Flock, ELSAG, and RTCC photographs of Sturdivant's black Camaro to verify his cell phone and car were in the same place at the same time.  From here he inferred that Sturdivant was driving the black Camaro.

---

[6] All numbers approximate, some slides use multiple data sources.  *See, e.g.*, Ex. A at 66 (Points on a Google map with cell tower data hits on towers and ALPR hits around the time and place of Robbery 6).

18

III.    **ARGUMENT**

Sturdivant now challenges the querying of ALPR data without a warrant to read his black Camaro's license plate and other external features.  But his claim that the ALPR query invaded his reasonable expectation of privacy against searches of the exterior of his car and license plate defies logic and established parameters of Fourth Amendment caselaw.  The ALPR systems that law enforcement used cannot track the whole of Sturdivant's movements such that *United States v. Carpenter*, a case about cell phone location information with a holding that the Supreme Court explicitly described as "narrow," applies.  585 U.S. 296 (2018).  The Court should therefore deny the Motion because it does not establish a violation of Sturdivant's reasonable expectation of privacy.

Even if the ALPR query without a warrant were deemed an unconstitutional search, law enforcement acted with a good faith belief that the query did not require a warrant.  Suppression is therefore unwarranted.

Additionally, Sturdivant's own decision to report his car as stolen allowed law enforcement to connect him to the suspected black Camaro independent of the ALPR search.  The only information the initial ALPR search provided—a license plate that allowed law enforcement to identify Sturdivant as the registered owner of the black Camaro—would have been inevitably discovered even if the ALPR query never happened.  In that respect, any relief sought by Sturdivant would be limited to the evidence collected from the initial ALPR query and not any of the additional evidence gathered in this case.

A.    **Standard.**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. Rather than listing reasonable searches, the Constitution "merely proscribes those which are

unreasonable." *United States v. Yang*, 958 F.3d 851, 858 (9th Cir. 2020) (quoting *Morgan v. United States*, 323 F.3d 776, 780–81 (9th Cir. 2003)).  But a search into an area "cannot result in a Fourth Amendment violation unless the area is one in which there is a "constitutionally protected reasonable expectation of privacy." *New York v. Class*, 475 U.S. 106, 112 (1986) (quoting *Katz v. United States,* 389 U.S. 347, 360 (1967) (Harlan, J., concurring)).  Such an expectation is therefore a necessary precondition before a search can be deemed unreasonable. *United States v. Ellison*, 462 F.3d 557, 560 (6th Cir. 2006).  The burden of proof is on a defendant to demonstrate that he has a reasonable expectation of privacy in the subject of the Government's warrantless search.  *See United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005).

**B.**  **ALPR Data Are Not Sturdivant's "Persons, Houses, Papers, and Effects" Such That the Fourth Amendment Gives Him a Reasonable Expectation of Privacy in Them.**

As a threshold matter, Flock and ELSAG ALPR data are not covered by the plain text of the Fourth Amendment.  The Fourth Amendment secures only an individual's "person[], houses, papers, or effects."  U.S. Const. amend. IV; *see Carpenter*, 585 U.S. at 342 ("*each* person has the right to be secure against unreasonable searches ... in *his own* person, house, papers, and effects" (internal quotation omitted)) (Thomas, J., dissenting).  ALPR data consists of photographs taken by third-party cameras pointed at public roads that are catalogued for searching external vehicle features.  Such data are not owned, or even possessed, by any individual driving a photographed car.  The Fourth Amendment therefore gives Sturdivant no personal right to challenge the collection or querying of ALPR data.  *Katz*, 389 U.S. at 351 ("For the Fourth Amendment protects people, not places.").

The United States recognizes that *Carpenter* at least implicitly held that certain cell phone location information ("CSLI," defined further below in § III.D) are "papers or effects" in

20

which an individual may have an expectation of privacy those data track the whole of his movements.  585 U.S. at 319 ("If the third-party doctrine does not apply to the modern-day equivalents of an individual's own 'papers' or 'effects,' then the clear implication is that the documents should receive full Fourth Amendment protection.  We simply think that such protection should extend as well to a detailed log of a person's movements over several years." (internal quotation omitted)).  The majority in *Carpenter*, however, did not explicitly make that finding, nor would such a finding necessarily apply to the case here given the location-tracking differences between cell phone location data and ALPR queries.  *See* (*infra*, § III.D.2).  Additionally, several of the dissents in *Carpenter* discuss his argument that cell phone location data are "in essence his personal papers by operation of 47 U.S.C. § 222 [the Telecommunications Act of 1996]."  585 U.S. at 331 (Kennedy, J., dissenting).  Setting aside the propriety of that argument and assuming that it formed the basis for the majority's decision, it shows that CSLI data are "papers" because a statute says so.  That conclusion says nothing about ALPR data, which do not fall under that Act.  In short, there is no basis for holding that ALPR data is the modern-day equivalent of an individual's papers.

But even if ALPR data are "papers or effects," Sturdivant does not have a reasonable expectation of privacy in them.  And as explained below, *Carpenter* does not apply.

C.      **ALPR Queries Are Not Traditional Fourth Amendment Searches That Require Warrants.**

Courts use a two-pronged test to determine whether a "justifiable, a reasonable, or a legitimate expectation of privacy" exists.  *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (internal quotations omitted).  First, they determine "whether the individual, by his conduct, has 'exhibited an actual (subjective) expectation of privacy . . .'"  *Id.* (quoting *Katz*, 389 U.S. at 361).

Second, they decide "whether the individual's subjective expectation of privacy is 'one that society is prepared to recognize as reasonable . . . .'" *Id.*

> 1.   Sturdivant Did Not Have a Subjective Expectation of Privacy in the Exterior of His Car or License Plate, nor the Limited Compilation of Data from Photographs of the Same.

Drivers taking their cars on public roads do not act consistent with a belief that external car features should be kept private.  The Constitution only protects what is private; conversely, what "a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection."  *Ellison*, 462 F.3d at 561 (6th Cir. 2006) (quoting *Katz,* 389 U.S. at 351–52).  Sturdivant acted consistent with the typical driver by driving his black Camaro into public.  He drove it on streets around Cuyahoga County, with its exterior and temporary license tag exposed.  The car appeared to passers-by and fellow drivers as it does in photos captured via ALPRs.  He further registered the car with the State of Ohio under his name, which law enforcement can use to identify him as the car's owner.  Had Sturdivant wished to keep his car private, he would not have put it in plain sight as he did.  He had no subjective expectation of privacy in his car exterior that he now claims law enforcement "searched."

> 2.   Society Does Not Recognize a Right of Privacy in License Plates.

Even if Sturdivant had attempted to keep his car exterior and license plate private, society does not recognize a privacy right in information designed to provide public identifiers.  Courts have held repeatedly that the exterior of a car, including the license plate, is "thrust into the public eye" such that examining it "does not constitute a 'search'" for Fourth Amendment purposes."  *Ellison*, 462 F.3d at 561 (quoting *Class*, 475 U.S. at 114).  The license plate's "very purpose" is to give both law enforcement and the public identification information for the car on public roads.  *Id.*  Various laws require license plates in plain view because they, like Vehicle Identification Numbers, play "the important role . . . in the pervasive governmental regulation of

22

automobiles." *See Class*, 475 U.S. at 114 (finding no reasonable expectation of privacy in a VIN); *Ellison*, 462 F.3d at 561 (applying *Class* and finding no reasonable expectation of privacy in a license plate).

Sturdivant's car exterior and license tag[7] were likewise publicly presented so that the public can identify the black Camaro as his car.  By choosing to drive his car, he "must expect that the State, in enforcing its regulations, will intrude to some extent upon [his] privacy" by observing his license plate and car exterior.  *Class*, 475 U.S. at 113.  Such observations, even via video, do not intrude on the Fourth Amendment.[8]  This analysis also does not change just because Sturdivant's license plate information was gathered into a database and queried using exterior car features.  *See* (R. 93: Motion, PageID 1357 (claiming "the government needs a warrant to query ALPR data)).  If a driver has no privacy interest in the collected information about his car, he cannot manifest an expectation of privacy simply because that data is documented in a computer system.  Sturdivant has no such expectation of privacy in his car

---

[7] It would strain reason to suggest a temporary license tag in a rearview window, like what Sturdivant had in his black Camaro, should be treated any differently than a permanent license plate affixed to the back of a car.  Both serve the same function of identifying cars on the road, and one or the other must be displayed for a car to traverse the road legally.

[8] The use of video surveillance equipment does not alter this analysis when the video captures non-private spaces.  *See United States v. May-Shaw*, 955 F.3d 563 (6th Cir. 2020) (23 days of pole camera surveillance video of a parking lot and car port next to an apartment complex did not violate the Fourth Amendment); *United States v. Trice*, 966 F.3d 506, 519 (6th Cir. 2020) (video surveillance of a shared hallway was not a Fourth Amendment search because the defendant had no reasonable expectation of privacy in those spaces); *United States v. Houston*, 813 F.3d 282, 288 (6th Cir. 2016) (no Fourth Amendment search occurred when police placed a camera on a public utility pole to record the area around a defendant's trailer).  This rule holds true for even prolonged periods of surveillance.  *See, e.g.*, *United States v. House*, No. 23-1950, 2024 WL 4677017, at *7 (7th Cir. Nov. 5, 2024) (affirming use of pole camera trained on the exterior of a suspect's house for 13 months because "a person's expectation of privacy does not extend to the things he knowingly exposes to the public").

exterior.  He therefore cannot develop such an expectation in data gathered in the ALPR system that photographed his car and made it searchable.

The analysis does not change merely because that exterior was photographed.  Traffic cameras and other public cameras are ubiquitous, and any reasonable person understands that fact.  Moreover, it is reasonable to expect that photographs are catalogued in the way they were here, and the systems certainly do not violate any reasonable expectation of privacy.

*** 

Based on the Supreme Court's subjective and objective test, Sturdivant does not have an expectation of privacy in the exterior of his car or his license plate or the compilation of photos taken of the exterior of his car as he drove on public roads.  The information gained through officers' observations of Sturdivant's car, including those via the ALPR system, therefore did not violate the Fourth Amendment.

**D.**      **ALPRs Do Not Track "the whole of . . . Physical Movements" That Would Trigger Application of _Carpenter_.**

Sturdivant's attempt to fit the square peg of ALPR information into the round hole of _Carpenter_'s narrow holding regarding cell phone tracking does not hold water.  ALPR data collects vehicle information from public spaces.  It captures discrete photographs of the vehicle without identifying the individual driver or providing comprehensive information about his travels.  It cannot track people inside buildings or private spaces, let alone track the "whole" of someone's physical movements.

It is true that _Carpenter_ established that "more sweeping modes of surveillance" may intrude further upon privacy rights than their component rudimentary observations.  _Carpenter_, 585 U.S. at 306 (discussing _United States v. Knotts_, 460 U.S. 276, 282 (1983) and its holding that "a person traveling in an automobile on public thoroughfares has no reasonable expectation

24

of privacy in his movements from one place to another.")  But the key components of *Carpenter* distinguish its "narrow" holding from the issue presented here.  Cell-site location information (CSLI) at issue in *Carpenter* gives law enforcement thousands of data points about a person's location.  It can penetrate house walls, follow a person from one place to another, and is akin to "near perfect surveillance, as if it had attached an ankle monitor to the phone's user."  *Carpenter*, 585 U.S. at 312.  ALPR queries cannot reconstruct that detailed a record by gathering photographs of license plates on public roads.  As discussed below, many courts have rejected the illogical extension of *Carpenter* onto ALPR systems for which Sturdivant now advocates.  This Court should similarly recognize that cell phones are not license plates or vehicles on public roads and deny his request.

<blockquote>1.     <u>*Carpenter* Requires a Warrant for a CSLI Search That Allows Officers to Track the Entirety of a Person's Physical Movements.</u></blockquote>

The Supreme Court in *Carpenter v. United States* examined whether the government conducts a Fourth Amendment search "when it accesses historical cell phone records that provide a comprehensive chronicle of the user's past movements."  585 U.S. at 300.  Each portion of that issue statement became crucial to the Court's holding:  cell phone records access is a search because "individuals have a legitimate expectation of privacy in 'the whole of [their] physical movements.'"  *United States v. Bowers*, No. 2:18-CR-00292, 2021 WL 4775977, at *2 (W.D. Pa. Oct. 11, 2021) (quoting and analyzing *Carpenter*).  The Court found, first, that cell phones "tap into a wireless network several times a minute" to generate CSLI.  *Carpenter*, 585 U.S. at 300.  It also found that a cell phone is "almost a 'feature of human anatomy," meaning it "nearly exactly tracks the movements of its owner."  *Id.* at 311 (quoting *Riley v. California*, 573 U.S. 373, 395 (2014).  Critically, this tracking "faithfully follows its owner beyond public thoroughfares and into private residences . . . and other potentially revealing locales."  *Id.*  The

25

Court in *Carpenter* therefore reasoned that CSLI is "unique" because it "provides an all-encompassing record of the holder's whereabouts" with "near perfect surveillance." *Id.* at 309, 311–12.

 *Carpenter* took great pains to distinguish CSLI from other personal information.  In discussing its prior opinions in *United States v Miller* (rejecting a Fourth Amendment challenge to collection of his business records in custody of a bank, 425 U.S. 435, 443 (1976)) and *United States v. Smith* (rejecting a Fourth Amendment challenge to a pen register that collected defendant's call information, 442 U.S. 735, 743–44), the *Carpenter* majority noted the "world of difference between the limited types of personal information addressed in *Smith* and *Miller* and the exhaustive chronicle of location information casually collected by wireless carriers today". *Carpenter*, 585 U.S. at 314.  It reasoned that the government failed to appreciate that "there are no comparable limitations on the revealing nature of CSLI" because it so exactly chronicles a person's movements.  *Id.*  The opinion further clarified that its decision "is a narrow one," expressly declining to "call into question conventional surveillance techniques and tools, such as security cameras." *Id.* at 316.  It emphasized "the unique nature of [CLSI]" provided heightened tracking capacities that drive the need for the extra layer of Fourth Amendment protection, before governments can obtain it.  *Id.* at 309.  But it expressly declined to extend beyond CSLI beyond other surveillance measures.  *Id.* at 316 ("We hold only that a warrant is required in the *rare case* where the suspect has a legitimate privacy interest in records held by a third party." (emphasis added)).

>2. ALPR Data Does Not Enable Law Enforcement to Track the Entirety of a Person's Physical Movements.

 The unique nature of CSLI drives the conclusion that *Carpenter* should not be applied to ALPR queries.  Unlike CSLI, ALPR cameras capture a car driving by a particular place from

camera at a fixed location and vantage toward a public road.  They identify the car's external features, focusing primarily on the license plate or temporary tag.  They catalogue those features and hold the data for a limited time (Flock holds the data for 30 days).  ALPR cameras capture publicly available information.  They cannot log "a record of: where you slept last night, what gun stores you go to, what mosque you attend, what doctor you visit, what sex-toy shop you like, what marijuana dispensary you frequent, or what gay bar you prefer."  (R. 93: Motion, PageID 1359).  Tracking a person into private homes, businesses, and religious institutions requires greater precision than ALPR hits can create.  ALPR cameras do not point into private homes; doing so would run contrary to the ALPR's purpose "to capture and analyze vehicles' license plates."  *United States v. Martin*, No. 3:23-CR-150, 2024 WL 4476560, at *1 (E.D. Va. Oct. 11, 2024).  A person appearing on a camera cannot be searched or even observed from ALPR image captures of the road from atop a utility pole.[9]  None of the data captures a person's movements; only the vehicle, which while registered to one person could be driven by anyone.

In this case, ALPR data never provided CSLI-level precision of location tracking necessary to implicate *Carpenter*'s reasonable expectation of privacy.  Even with his license plate number, law enforcement collected 22 ALPR hits for a black Camaro with a temporary tag and a bumper sticker.  *See* (Ex. D).  These data showed little information about where the Camaro came from, where it was going, or even who was driving it.

---

[9] Even if an ALPR camera aiming at a license plate were to incidentally show another person's location information by capturing him entering a building or driving a car, ALPR hits still cannot map an entire person's movements that triggers *Carpenter* application.  The opinion itself recognized that it does not apply to one-off location data records when the system itself does not capture the whole of a person's movements.  *See Carpenter*, 585 U.S. at 316 ("Nor do we address other business records that might incidentally reveal location information.").

Contrary to the Motion's hyperbole, law enforcement was never able to use "a few searches" of ALPR data to "create a 131-page PowerPoint presentation tracking Sturdivant's alleged movements over time."  (R. 93: Motion, PageID 1352).  Of those 131 pages, only 22[10] came from ALPR data.  *See* (Ex. A).  The remaining information came from other sources that Sturdivant does not challenge, like cell phone location records pursuant to a warrant, RTCC cameras, in-store surveillance cameras, and witness statements about the robberies.  The Motion places great emphasis on how the handful of ALPR hits created a "dossier of movements over the course of a month" via the PowerPoint presentation.  *See* (R. 93: Motion, PageIDs 1346, 1352, 1360, 1370).  Never once does the Motion recognize that ALPR information was a small portion of a larger investigation toward identifying who held up 10 stores at gunpoint.  If anything, the presentation shows ALPR data is not an "eerily precise record of" Sturdivant's movements (R. 93: Motion, PageID 1361).  Large portions of time remain unaccounted for in the presentation.  Law enforcement was unable to leverage ALPR—or even the broader compilation from various sources—to track Sturdivant in public, much less find his home, work, or other places he traveled.  Even if Sturdivant were correct that all 131 pages relied on ALPR data, they still do not amount to the "12,898 location points cataloging Carpenter's movements—an average of 101 data points per day."  *Carpenter*, 585 U.S. at 302; *see Yang*, 958 F.3d at 862–63 (J. Bea, concurring) (the searched ALPR database, despite containing "approximately 5 billion

---

[10] The United States reached this number by identifying slides showing specific ALPR data hits. It did not count slides showing a combination of those ALPR hits and other data.  Although this number is therefore approximate, it demonstrates that ALPR is not the focus or lynchpin of the presentation's information.

vehicle location entries," still could not reach the precision necessary to track "the whole of" defendant's physical movements.).[11]

District courts regularly identify the disconnect between the holistic location tracking of CSLI and public license plate data collection to reject *Carpenter*'s application to ALPR queries. *See United States v. Rubin*, 556 F. Supp. 3d 1123, 1128-30 (N.D. Cal. 2021) (denying motion to suppress use of database to access vehicle location records); *Bowers*, 2021 WL 4775977, at *3-5 (same and collecting cases); *see also Martin*, 2024 WL 4476560, at *2 (rejecting motion to suppress a search of Flock ALPR data in Hobbes Act robbery case by finding that defendant had no expectation of privacy and collecting cases holding the same); *United States v. Toombs*, No. 1:22-cr-306, 2023 WL 3224962, at *7–9 (N.D. Ala. May 3, 2023) (citing *United States v. Wilcox*, 415 F. App'x 990, 992 (11th Cir. 2011) to find that pre-*Carpenter*, "the capture of an image of a license plate by tag reader technology didn't violate the Fourth Amendment"); *United States v. James*, No. 6:21-CR-00176, 2023 WL 3370421, at *4–6 (W.D. La. Jan. 30, 2023)

---

[11] For similar reasons, the Fourth Circuit's decision in *Leaders of a Beautiful Struggle v. Baltimore Police Department* does not apply to ALPR data queries.  2 F.4th 330, 333 (4th Cir. 2021).  Like *Carpenter*, *Beautiful Struggle* involved a similar all-encompassing surveillance program that allowed law enforcement to track and monitor every Baltimore resident's movements during daylight hours, every day.  *Id.* at 333–34.  The aerial surveillance monitoring could follow anyone from the time they left their home in the morning to wherever they traveled during the day.  *Id.* 342–43.  Applying *Carpenter*, the court found his persistent monitoring allowed law enforcement to open "an intimate window" into individuals' "associations and activities," which violated their reasonable expectation of privacy "in the whole of their movements."  *Id.* at 342.  But unlike that aerial surveillance, ALPR data cannot "provide such an intrusive window" into a person's life.  *Martin*, 2024 WL 4476560, at *10 (denying motion to suppress Flock ALPR data by finding in part that *Carpenter* and *Beautiful Struggle* did not apply).  *Beautiful Struggle* provides no independent reason outside of *Carpenter* to suggest that ALPR data can be used to track the whole of someone's movements.

(denying motion to suppress ALPR data); *United States v. Graham*, No. 21-645, 2022 WL 4132488, at *4–5 (D.N.J. Sept. 12, 2022) (same); *United States v. Porter*, No. 21-cr-00087, 2022 WL 124563, at *2–3 (N.D. Ill. Jan. 13, 2022) (same); *United States v. Brown*, No. 19cr949, 2021 WL 4963602, at *3-4 (N.D. Ill. Oct. 26, 2021) (same).  These holdings rely on the fact that ALPR data cannot provide the same detailed location information contained in CSLI.  Although the Court of Appeals has yet to substantively address the issue,[12] the reasoning of courts that do stands consistent with *Carpenter* and established Fourth Amendment cases like *Katz*, *Smith*, *Miller*, and *Knotts*.  This Court should similarly reason that ALPR data cannot precisely track a person given its limited capture of public information that does not invade the reasonable expectation of privacy a person has in the whole of his movements.

      **E.**      **Even If ALPR Use Constituted a Search, the Court Should Not Suppress Evidence That Sturdivant Committed the Alleged Robberies.**

      Alternatively, should the Court reject the reasons stated herein that *Carpenter* does not apply to ALPR queries and find that officers conducted a Fourth Amendment search by looking for a Sturdivant's black Camaro, it still should not "dismiss the indictment" against him or even exclude evidence.  (R. 93: Motion, PageID 1347).  Such action would ignore a key tenant of Fourth Amendment law that officers acting in good faith make exclusion unwarranted.  *See Herring v. United States*, 555 U.S. 135, 137 (2009) ("suppression is not an automatic consequence of a Fourth Amendment violation").  It would also ignore the fact that officers would have inevitably become aware of Sturdivant's connection to his black Camaro when he

---

[12] *See United States v. Mapson*, 96 F.4th 1323, 1334 n.7 (11th Cir. 2024), *cert. denied,* No. 24-5268, (U.S. Oct. 7, 2024) (noting there is "very little in the caselaw and academic literature about whether the acquisition of ALPR data constitutes a Fourth Amendment search that requires a warrant.").

chose to report it to police as stolen.  Given that Sturdivant told law enforcement that the Camaro was his, law enforcement would have inevitably discovered his ownership even if the ALPR query never happened.

          1.      <u>Officers Acted in Good Faith When Searching for Sturdivant's Car Using ALPR Information.</u>

The good faith exception can allow admission of evidence despite the general exclusion of such evidence obtained in violation of the Fourth Amendment.  Evidence "obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule."  *Mapson*, 96 F.4th at 1334–35 (addressing ALPR after *Carpenter* and quoting *Davis v. United States*, 564 U.S. 229, 241 (2011)).  Put differently, "evidence seized in reasonable, good faith reliance" on either a latently-defective search warrant or a law later deemed unconstitutional should not be suppressed.  *United States v. Carpenter*, 926 F.3d 313, 317 (6th Cir.), *on reh'g,* 788 F. App'x 364 (6th Cir. 2019); *see United States v. Leon*, 468 U.S. 897, 905 (1984) (applying good faith exception to a "warrant subsequently held to be defective"); *Illinois v. Krull*, 480 U.S. 340, 352 (1987) (extending *Leon* good faith exception to evidence obtained in reasonable reliance on a statute later deemed unconstitutional).  Indeed, after the Supreme Court decided CSLI data required a warrant in *Carpenter*, on remand the Sixth Circuit held that the good faith exception applied in denying defendant's motion to suppress his CSLI data.  *Carpenter*, 926 F.3d at 318.  The Sixth Circuit found the good faith exception especially important to avoid "'embarrass[ing] the future' . . . [by] incrementally adapt [ing] . . . Fourth Amendment jurisprudence to advancements in the digital era."  *Id.* (quoting *Carpenter*, 585 U.S. at 316).

Neither the Supreme Court nor Court of Appeals has ruled that collection and review of ALPR data requires a search warrant.  The Circuits that have considered it, specifically the Ninth

in *Yang* and the Eleventh in *Mapson*, decided their cases without addressing the merits of ALPR review within the Fourth Amendment.  In the Sixth Circuit, cases like *Ellison* indirectly support querying ALPR systems without a warrant.  *Ellison* upheld the Supreme Court's tenant in *Class*, 475 U.S. at 114, that "[t]he exterior of a car, of course, is thrust into the public eye, and thus to examine it does not constitute a 'search.'"  *Ellison*, 462 F.3d at 561.  So when IOIS Thrush queried ALPR systems to find Sturdivant's car in December 2021, they did so believing the law allows them to search car exteriors without a warrant.  They acted in good faith and on reasonable reliance on cases like *Yang*, which in 2020 did not hold that *Carpenter* applied by requiring a warrant for that ALPR search.  958 F.3d at 861 (refusing to decide the question because the defendant did not have a reasonable expectation of privacy in an overdue rental car).  The good faith exception to the exclusionary rule applies to ALPR searches in Sturdivant's case because no law or court decision, either before 2021 or today, gives law enforcement reason to believe such a search requires a warrant.

> 2.     Officers Would Have Discovered Sturdivant's Camaro and Connected It to the Robberies Without ALPR Assistance.

Should the Court determine that the good faith exception does not apply, any excluded evidence should be limited to that gained independently from identifying Sturdivant as the registered owner of the black Camaro between the time of the ALPR query and when Sturdivant told CPD he owned the Camaro.  The inevitable discovery doctrine "allows for the admission of evidence that would have been discovered even without the unconstitutional source."  *United States v. Cooper*, 24 F.4th 1086, 1091 (6th Cir. 2022) (quoting *Uta v. Strieff*, 579 U.S. 232 (2016)).  It flows from the idea that excluding evidence under the Fourth Amendment is rooted in deterrence; if the same evidence would have been found without the unconstitutional search,

"then the deterrence rationale has so little basis that the evidence should be received." *Id.* (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)).

Inevitable discovery can apply in two scenarios.  First, when there is "an independent, untainted investigation" that was bound to uncover the same evidence.  *Id.* (quoting *United States v. Kennedy*, 61 F.3d 494, 499 (6th Cir. 1995)).  Second, when "other compelling facts" demonstrate that discovery was inevitable.  *Id.*  In either case, the court asks "what would have happened had the illegality never occurred."  *Id.* at 1094 (6th Cir. 2022) (examining *Nix* and its holding that a separate "volunteer search team[]" would have found the same illegally obtained evidence).

Sturdivant's independent decision to report his black Camaro as stolen on December 26—and CPD officers finding the car one block away the same night—provided officers with the same information the ALPR query did a few days prior.  Before the ALPR query, law enforcement collected surveillance footage around the robberies and inside the stores.  They interviewed witnesses about seeing a black Camaro nearby and the suspect entering the store.  They already had the Marathon gas station surveillance footage of the black Camaro with a temporary license tag and black-and-white bumper sticker after robbery 5 because a witness saw the car parked nearby.  None of this evidence relied on knowing Sturdivant's identity.

The only new information IOIS Thrush's ALPR query provided was the license plate number that allowed law enforcement to search for Sturdivant's name and identifiers.  Sturdivant gave CPD that exact information when he reported his car as stolen.  *See* (Ex. D).  At most, the ALPR search made identifying Sturdivant and apprehending him happen faster.  Once he identified himself as the owner of the suspect black Camaro seen by witnesses and in surveillance footage of at least seven of the robberies, law enforcement would have obtained the

same search warrants for Sturdivant's car and house, CSLI, his iPhone, Google and Apple data. Had the ALPR search never occurred, the only difference in those search warrant affidavits would have been how law enforcement learned that Sturdivant was the Camaro's registered owner.  The ALPR search was not a necessary link in all such evidence tying Sturdivant to the robberies, let alone "the vast majority of the probable cause" as the Motion claims.  (R. 93: Motion, PageID 1356).  In this case, law enforcement would have inevitably discovered that Sturdivant owned the suspect black Camaro.  Suppression is therefore unwarranted.

IV.    <u>**CONCLUSION**</u>

License plates are not cell phones.  ALPR data sets are not CSLI repositories.  Sturdivant has a reasonable expectation of privacy in the whole of his movements, which is why the United States obtained a federal warrant for his cell phone data.  But he does not have a privacy right in external vehicle features that he displays for the world to see.  The Court should deny the Motion because it does not present a cognizable Fourth Amendment claim.  Even if it did, the Court should recognize that law enforcement acted in good faith when querying ALPR systems and likewise deny the Motion.  Alternatively, this Court should acknowledge that law enforcement would have learned Sturdivant registered and drove the suspect black Camaro because he told them he owned it when he reported it as stolen.  In such a case, suppression remains improper.

Respectfully submitted,

REBECCA C. LUTZKO
United States Attorney

/s/ Adam J. Joines
Adam J. Joines (Ohio Bar No. 0094021)
Margaret A. Kane (Ohio Bar No. 0082084)
Assistant U.S. Attorney
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, Ohio 44113-1852
(216) 622-3929
Adam.Joines@usdoj.gov
Margaret.Kane@usdoj.gov

*Counsel for the United States*